UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　Plaintiff,<br><br>v.<br><br>FAIRBANKS CAPITAL CORP. and<br>FAIRBANKS CAPITAL HOLDING<br>CORP.,<br>　　　　Defendants. | Civil Action No. 03-12219-DPW |
| ALANNA L. CURRY, *et al.,*<br>individually and on behalf of all<br>others similarly situated,<br>　　　　Plaintiffs,<br><br>v.<br><br>FAIRBANKS CAPITAL CORP.<br>　　　　Defendant. | Civil Action No. 03-10895-DPW |

## OBJECTION TO APPROVAL OF FINAL SETTLEMENT

Now comes Jack Overbaugh, Danny and Constance VanDale, and others represented by class counsel, and objects to the class settlement. As the following discussion makes clear, the notice of class settlement is confusing to West Virginia borrowers and proposed settlement agreement is unfair to class members.

## I. INTRODUCTION

A class of West Virginia borrowers whose loans are or were serviced by Fairbanks Capital Corp. ("Fairbanks") who filed a class action complaint against Fairbanks in January, 2003. Within days of the filing of the case, styled <u>Lucas v. Fairbanks Capital Corp</u>, Fairbanks was enjoined from

1

conducting foreclosures in West Virginia and adding illegal charges to West Virginia consumers' accounts. After protracted, lengthy settlement discussions, the case was ultimately settled, and the class of West Virginia consumers received significant equitable relief, including a prohibition against the assessment of several fees and charges and a change in foreclosure process designed to protect borrowers from inequitable foreclosure. In addition, the class members received substantial monetary (civil penalty) relief for Fairbanks' past illegal servicing and collection practices. The undersigned counsel (a non-profit legal services organization) and the class representatives, in their capacity as fiduciaries for the West Virginia class, object to the proposed settlement because the settlement would impair the rights of West Virginia consumers primarily to receive the full benefit of their class settlement with Fairbanks. Additionally, the settlement would harm all consumers by imposing an impediment to consumers obtaining adequate relief for damages they suffered due to Fairbanks' wrongdoing. These rights are especially important considering they affect the most important these individuals and families have – their homes. It is critical that this Court resolve the objections presented by the West Virginia consumers so that the settlement does not defeat borrowers' ability to save their homes.

Specifically, the West Virginia consumers object on two primary grounds. First, the notice of class settlement is confusing, because it provides contradictory information from the <u>Lucas</u> class settlement to West Virginia consumers. A substantial number of Fairbanks' borrowers are unsophisticated and are unable to understand the confusing notice and navigate the subsequent claims process, especially considering the documents contradict the notice sent to class members in the <u>Lucas</u> settlement.

Second, the proposed settlement harms borrowers because it (1) institutionalizes the charging

of certain fees to borrowers and ; (2) precludes certain equitable relief for borrowers facing foreclosure. With respect to the institutionalization of charges, counsel for Fairbanks and the industry in general is eagerly awaiting the settlement so that the standard for charging fees implicitly approved here by the FTC can be uniformly applied to the servicing industry. These fees have ben the subject of much criticism by United States Senators and consumer advocates, notwithstanding the fact that they are illegal under several state laws, most notably for the objectors purposes, West Virginia law. Nevertheless, Fairbanks now has stands to have these illegal charges "blessed by the FTC," thereby setting the standard for charging exploitive fees to low income borrowers.

Borrowers are also precluded from pursing equitable relief when they face foreclosure, despite the recognition by a number of jurisdictions that equity abhors a forfeiture. The proposed settlement essentially precludes the backending of payments (placing arrearages at end of the loan and continuing payments rather than insisting on a large reinstatement amount that a borrower cannot realistically pay). Rather, the proposed settlement streamlines the foreclosure process and appears to eliminate this very important remedy for many homeowners.

Finally, the settlement does not accord relief to borrowers on an equitable basis. Some get substantial relief for the illegal fees (unclear from the notice and claim forms how much) while the unsophisticated class members who can not negotiate the claims process get nothing. By contrast, West Virginia consumers received a full reimbursement of these charges. Were the <u>Curry</u> settlement to entice West Virginia borrowers to be included in this settlement, these borrowers would give up other relief with no corresponding benefit. More importantly, the relief nationwide is simply inadequate on its face because it does not equitably fully compensate borrowers.

The following section provides a background of the initiation of the two class actions, <u>Lucas</u>

and Curry, and the communications between the parties leading up to the settlement of both cases in an effort to highlight the resulting confusion for borrowers in West Virginia. In addition, this background is important to understand the substantive rights that borrowers in West Virginia and borrowers nationwide stand to lose because of the proposed settlement. Following the background is a discussion of the Objections and the deficiencies in the proposed settlement. Accordingly, for the reasons that follow the settlement should be rejected by this Court until such time as the parties have resolved the issues presented by this Objection.

**A.     Background.**

    1.     Filing of Action.

On January 2, 2003, the Plaintiff class of West Virginia consumers filed a complaint in circuit court in West Virginia to enjoin the assessment of all default charges and foreclosures by Fairbanks. The complaint sought equitable relief in the form of a change in Fairbanks servicing and foreclosure practices and monetary relief in the form of compensation for Fairbanks' bad faith servicing and illegal debt collection practices. The case, styled <u>Lucas v. Fairbanks Capital Corp</u>, No. 03-C-0002 (Cir. Ct. Lincoln County, W. Va. Jan. 3, 2003), was set for set for hearing on the Plaintiffs' Motion for Temporary Injunction and on January 8, 2003, the West Virginia state court entered a temporary injunction halting all foreclosures and the assessment of illegal fees being charged by Fairbanks.[1]

    2.     Settlement of All Claims.

---

[1] Simultaneously, the matter was scheduled for a preliminary injunction hearing on January 30, 2003. Three days prior to hearing, Fairbanks removed the action to federal court. The Plaintiffs subsequently moved to remand and the remand was briefed according to the court's briefing schedule.

After the injunction was entered, counsel for the Plaintiff class and general counsel of Fairbanks entered into extended settlement negotiations during the months of February and March, 2003. The negotiations were productive and the parties agreed to first to settle all equitable relief claims. Several drafts of the relief following agreement were exchanged and the result was an unsigned written agreement of all equitable relief claims in the Lucas case. The monetary issues, including any relief in the form of statutory penalties were subsequently negotiated and resolved in the last week of April, 2003. The monetary settlement was followed by limited telephone discussions in April and the first two weeks of May.

On May 15, 2003, Greg Harmer, General Counsel for Fairbanks, telephoned Plaintiffs' counsel at his office and stated (paraphrased), That's it. I am announcing at the national association meeting of foreclosure attorneys tomorrow (May 16th) in Philadelphia that the West Virginia case has been resolved and foreclosure servicing will resume in the near future.

3. Meeting with counsel for the Federal Trade Commission, Lucy Morris, and tender of Equitable Relief Order.

On May 16, 2003, the undersigned met with counsel for the Federal Trade Commission ("FTC"), Lucy Morris, at FTC's office in Washington, D.C. At her request, a copy of the unsigned agreement on equitable relief was delivered to Lucy Morris. At that meeting Ms. Morris indicated she would soon begin discussions between the FTC and Fairbanks relative to their practices and that certain of the matters set forth in the agreement between the West Virginia class and Fairbanks might be included in the nationwide settlement. Ms. Morris also suggested that it might be appropriate to carve out the West Virginia class.

4. Fairbanks Renege of Agreement.

On June 22, 2003, general counsel for Fairbanks e-mailed the undersigned stating, "I am ready to proceed. A couple of comments." (See Greg Harmer, E-mail to Daniel F. Hedges (June 22, 2003) (attached as part of Ex. B to Def. Fairbanks Opposition to Plaintiffs' Motion to Enforce Judgment, Lucas v. Fairbanks Capital Corp., No. 2:03-0061 *available at* http://pacer.wvsd.uscourts.gove/dc/ccgi-bin/pacer250.pl?puid=01081270722 (docket entry 32)).

In or about the Spring to Summer, Fairbanks hired Deborah Valentine, formerly with the FTC, to negotiate settlement with the FTC. Thereafter, the undersigned began receiving direct and indirect communications from General Counsel Harmer indicating Fairbanks intention to back out of the Lucas agreement. The communications also revealed that the reason Fairbanks sought to breach the settlement in the Lucas case was Fairbanks no longer wanted the agreement as it was because it believed it could get better terms from the FTC. Specifically, on numerous occasions, Harmer insisted that the certain default charges had been "blessed by the FTC."

It became clear by the end of June, 2004, that Fairbanks was not going to sign the agreed settlement documents. Accordingly, the Plaintiff class moved to enforce the settlement. See Lucas v. Fairbanks Capital Corp., No. 2:03-0061 (S.D.WVa.2003) visit at http://pacer.wvsd.uscourts.gov/dc/ccgi-bin/pacer250.pl?puid=01081270722. The United States District Court for the Southern District of West Virginia ordered the parties to conduct a series of conferences, with a federal Magistrate Judge to act as mediator, and other discussions to attempt to finalize the settlements. Through these negotiations, it was revealed that Fairbanks did not intend to sign the agreed settlement relative to equitable relief. However, in September, 2004, Fairbanks signed the agreement relating to the monetary relief, which was subsequently filed with the Court on September 30, 2003. See Lucas, supra, at docket entry 47. The district court subsequently

remanded the case to state court on October 15, 2003. See Lucas, supra, docket entries 49 & 50. After remand in October, a hearing was scheduled for November 21, 2003 on Plaintiffs' Motion to Preliminarily Approve the Monetary Settlement and Motion to Enforce Settlement (relating to equitable relief) . Due to illness in the Judge's family, the hearing was postponed to December 8, 2003.

     5.     "Blessed by the FTC."

The proposed settlement, specifically in Part V of the FTC Order establishes (i) the charging of so-called property preservation fees once every 30 days; (ii) the charging of so-called broker price opinion (BPO) fees once every six months, and (iii) regular attorneys not prohibited by state law. Senators Paul Sarbanes and Barbara Mikulski who were in great measure responsible for starting the FTC investigation of Fairbanks urged the FTC not to institutionalize the fees agreed to in the proposed settlement. (See Ex. A.) To be sure, there is great concern over the charging of the fees to borrower's account, particularly low-income borrowers, who are the bulk of Fairbanks' customers. Regular thirty day inspection fees (typically ranging from $9.95 to $20), hundreds of dollars of broker price opinion costs every six months, and hundreds of additional dollars in attorneys fees every few months would represent significant financial burden to many borrowers. These charges would push thousands of borrowers on fixed income beyond their monthly income and needlessly force them not foreclosure. In short, the addition of these fees to many of Fairbanks' borrowers will directly result in the loss of these borrowers' homes. These fees, which had heretofore been denounced as exploitive and illegal in many jurisdictions, suddenly, in the words for Fairbanks counsel, became "blessed by the FTC."

     6.     Streamlined foreclosures.

Senators Sarbanes and Mikulski were also concerned about the FTC agreeing to a streamlining of the foreclosure processes. Historically foreclosure was a last resort for lenders because the forced sale of a home was considered a loss for all parties. However, due in large part to the emergence of servicing companies, who do not actually hold the loan they service, and the streamlining of the default process and procedures proposed by this settlement, foreclosures will be quicker and likely more widespread. Under the proposed settlement, and its likely effect on the industry, the values that attended the protection of the family home are lost to the streamlining of foreclosure.

7. Miscommunication between <u>Curry</u> counsel and Fairbanks' Counsel and Lucas counsel.

On Monday, December 1, 2003, the undersigned counsel received a call from Plaintiffs' counsel for the <u>Curry</u> case, who urged that the undersigned contact Fairbanks' counsel because that in addition to the settlement reached in the <u>Lucas</u> settlement, if acted upon within week, additional relief for the West Virginia class was likely. The undersigned reiterated the status of the West Virginia two settlements – that is that the monetary relief settlement was signed and the equitable relief settlement was pending pursuant to a Motion to Enforce Settlement, and a hearing was scheduled for December 8. The undersigned also inquired whether anything in the <u>Curry</u> settlement might impact the West Virginia class, and counsel for the <u>Curry</u> Plaintiff class responded in the negative.

On Monday and Tuesday, December 1 - 2, 2003, in response to counsel's suggestion, the undersigned attempted to telephone Fairbanks' counsel, to no avail. But on the evening of December 2 or 3, 2003, at his residence, undersigned counsel received a call from Greg Harmer, General

Counsel for Fairbanks, who indicated he was returning the call from trial counsel. Harmer requested that the West Virginia settlement be dropped and that the West Virginia class members join the Curry class. When the undersigned refused the request, Harmer then discussed the West Virginia hearing set for Monday, December 8, 2003, and informed the undersigned that he could not be present to present testimony on the Motion to Enforce. The undersigned reiterated the Lucas class' intention to proceed with these settlements.

On Wednesday, December 3, 2003, the undersigned counsel informed Curry Plaintiffs' counsel of the Harmer communication and the lack of communication with trial counsel. Again the undersigned inquired of whether the West Virginia case would be impacted by the Curry litigation and the response was negative. In none of these conversations was there any reference to the then-pending motion in the Curry case, which sought to enjoin all other litigation.

    8.    December 5, 2003 Preliminary Approval Hearing.

Unbeknownst to the undersigned, this Court held a preliminary approval hearing on December 5, 2003. The Court inquired about the status of other actions involving Fairbanks, indicating a desire on the part of the Court not to predetermine the outcome of discussions as to whether the other pending cases would be joined into the Curry settlement. Fairbanks' counsel responded, "I can provide certainly my assurance and my client's assurance that will not happen." Tr. at 14.) The following exchange between the Court and counsel occurred:

> MR. HEFFERON: . . . .And the other three, it's fair to say that we are in discussions with all three of them to see if we can get them to be involved in this process.
> 
> ***
> 
> That's the reason why we were asking for the injunction, because we have the same problem, which is there's a lot of cases in the state court as well as individual cases in state court.

9

> THE COURT: Well, you know, I guess my – I'll tell you my inclination, but you people understand the practicalities better than I. I'm always uncomfortable issuing injunctions against other litigation. I understand the reasons for doing it and I'm inclined to do it here. <u>But what I don't want to do is in some fashion pretermit [predetermine] whatever discussions you're having with these people.</u> To the degree that they want to be brought into the case, of course, they should be brought into the case.
>
> MR. HEFFERON: <u>I can provide certainly my assurance and my client's assurance that that will not happen.</u>
>
> ***
>
> THE COURT: But I just want to be sure that the way in which this is developed is not going to unfairly interfere with the ability of these parties to deal with - - or further discussions of getting wrapped up into this case.

(Tr. at 13-15 (Dec. 5, 2003)) (emphasis added) (attached as Ex. C).

9. Institutionalization of Exploitive Default Charges.

If there is any question that the proposed settlement institutionalizes default charges, it should be resolved considering the already apparent impact of the settlement on the financial service industry. Mouths watering, the financial service industry has scheduled a conference to implement the new FTC-approved fees and standards for May 24 - 25, 2004, ten days following the Fairness Hearing before this Court entitled, "Mortgage Servicing - Implementing New Industry Standards Post Fairbanks." Included in the conference are sessions labeled as, "How to incorporate the Fairbanks' guidelines into your client's servicing," "The status of Fairbanks as "an industry standard," "Implementing Post Fairbanks Processes for Charging Fees, Disclosures and Disputes," "The Impact of Fairbanks' Settlement on the Mortgage Industry," "Has Fairbanks Created a New Federal Standard?" and "Overcoming Barriers to Implementation." (See Ex. B.)

10. Prehearing Discussions December 8, 2003.

Early on December 8, 2003, the undersigned counsel received a call from local West Virginia

counsel for Fairbanks. Local counsel stated that she had received a call from Fairbanks' counsel, who informed her that this Court had enjoined all other litigation involving Fairbanks, and as result, the parties could not proceed with further settlement discussions, the approval hearing, or the litigation in any way. The undersigned counsel, very surprised given the conversations of the previous week with counsel from the Curry case, proceeded with an internet check of the Curry case docket. Finding no order, the undersigned contacted the clerk, who informed that a hearing had been held, but no order yet entered.

The undersigned then telephoned Curry Plaintiffs' counsel to discuss the apparent contradiction with the discussions of the previous week. Curry Plaintiffs' counsel indicated that no motion to enjoin other litigation had been filed that he was aware of when the parties had spoken on December 3. However, the Curry docket indicates the motion was nonetheless filed on December 1, 2003. The undersigned was understandably disturbed by what appeared to conflicting information received from Curry counsel, and what the undersigned believed to be misleading conduct. In further conversations with Curry Plaintiffs' counsel, the undersigned was assured that the Lucas class counsel had not been intentionally mislead, but rather the confusion resulted from an inadvertent miscommunication.

11. Fairbanks' attempt to thwart settlement and state court approval of stipulation of settlement and certification of questions.

Lucas counsel proceeded on pending motions in West Virginia state court on December 8, 2003. Counsel for Fairbanks argued strenuously that the state court lacked jurisdiction because of the Curry injunction. The Plaintiff contended that no Order had been entered, and Fairbanks was unable to produce for the state court an Order entered in the Curry case for the state court to

determine whether indeed the Lucas case had been enjoined. After almost two hours of hearing, the state court (1) preliminarily approved the monetary settlement stipulation, and (2) heard arguments on the two legal issues that in recent months were the stumbling blocks to entry of the equitable relief order, ruled on the issues, and certified the two issues to the Supreme Court of Appeals of West Virginia. (See Ex. D.) A final approval hearing was scheduled for February 23, 2004.

12. Finalization of the Equitable Relief Order.

In the days following the hearing, counsel for Fairbanks changed its position, acknowledged the monetary settlement and agreed to proceed with finalization of the equitable relief order. After several telephone conferences, the Order was entered January 27, 2004. (See Ex. E.) The Order granting equitable releif requires the following:

> Removal of Charges and Changes in Practices for All Class Members: (a) Fees. Fairbanks may not add any fees to accounts other than bonafide late fees[2] (not exceeding $15 dollars), in no event sooner than ten days after the due date of the scheduled installment. Attorneys fees, property inspection fees and most brokers price opinion fees are not permitted. Escrow amounts include only amounts authorized by agreement (a) as are necessary to pay taxes or (b) as are necessary for insurance you purchased or forced placed insurance only during those months in which the consumer actually has no insurance. Foreclosure will not be pursued for nonpayment of insurance only. Within sixty days of February 23, 2004, all members of the class shall receive a letter crediting or reversing all impermissible fees earlier charged, setting forth the amounts and type of each credit and the total credits against future payments, or reversal of the charges.
> (b) Return of Payments Prohibited. All future payments shall be credited upon receipt against payments due, and prior to crediting taxes, insurance or fees.
> (c) Account Records. New readable account records on court ordered form.
> (d) West Virginia Servicing Team. Telephone numbers for general and delinquency-related issues shall be included on the monthly statement. Fairbanks' designated representative will receive and respond to individual inquiries, and listen to and consider requests for payment alternative requests. Fairbanks will timely

---

[2] This means virtually all late fees must be returned because they were illegally pyramided, and secondly they were based on earlier payments having been attributed to illegal fees.

provide information requested.

(e) <u>Trustee's Duties</u>. Fairbanks recognizes that the trustee on a deed of trust owes some fiduciary duty to the consumer and the creditor. The trustee will not serve as collection agent for the creditor prior to serving as trustee in a foreclosure. Once the account is referred to the trustee, the trustee will accept from Fairbanks for foreclosure only those loans with complete month by month account records to enable the trustee to make a determination of the actual amount due. Only after the receipt of the complete information from Fairbanks and review of the account records will a trustee provide notice to the borrower of a foreclosure in a prescribed form.

(f) <u>Dispute Regarding Foreclosure</u>. If the trustee determines that there is a bona fide dispute as to the amount claimed or that Fairbanks has not considered all reasonable alternatives to foreclosure, then any party may institute an action in the Circuit Court for court determination of (i) amounts due or (ii) whether Fairbanks considered alternatives to foreclosure.

(g) <u>Forbearance Agreements and Collection Letters</u>. No agreement shall be used to waive a consumer's rights, claims or defenses. Collection letters will not threaten loss of homes.

(h) <u>Committee Review of Those Accounts in Referral to Foreclosure, since January 2003</u>. A committee will review those accounts, take into consideration the needs of the homeowner and creditor on each account, and attempt an accommodation; if there is none the Court will decide.

(Ex. D.)

During the process of finalization of the <u>Lucas</u> class settlement for West Virginia class members, counsel for Fairbanks indicated that if the West Virginia class members would agree to participate in the <u>Curry</u> settlement, West Virginia borrowers would get the cash reimbursement on the same basis as every other national class member. Plaintiffs' counsel for <u>Lucas</u> included in the class notice that class members did not have to chose between the <u>Curry</u> and <u>Lucas</u> settlement based on Fairbanks counsel's assurance that if all West Virginia class members would receive cash reimbursement identical to other class members nationally, notwithstanding the <u>Lucas</u> settlement. In the last week of January, 2004, the <u>Lucas</u> class notice was properly mailed to all West Virginia class members. On February 23, 2004, a fairness hearing was held and settlement approved subject to the restrictions set forth in the Order. (<u>See</u> Ex. F.)

13

14. Confusing and conflicting class notices.

The West Virginia class members also received a class notice from the Curry settlement in late February/early March. The notice provided among other things the right to file a claim for reimbursement for damages for fees (but not providing for full reimbursement of illegal default charges). There were many inconsistencies between Lucas class notice and the Curry class notice. The conflicting notices resulted in confusion among West Virginia borrowers. Borrowers contacted the undersigned raising, among others, the following questions:

> (1) Considering all of the fees were going to be reversed and reimbursed pursuant to the Lucas settlement, were borrowers also going to receive the cash on the same basis as others nationally as set forth in the Curry claims form? The undersigned responded that class members would indeed receive additional compensation based on Fairbanks' counsel's representations.
> (2) Why does the Lucas class settlement declare that all the Fairbanks' fees charged were illegal and the Curry claim form states that some of them were illegal and some of them were not?

Apparent from the inquiries received, the Curry class notice was confusing to West Virginia borrowers. Of the calls, none of the West Virginia borrowers understood what the notice meant. Accordingly, these borrowers could not make an informed choice relative to the notice.

After a tremendous volume of inquires, the undersigned counsel communicated with Lucy Morris, FTC counsel, in the third week of March with several inquiries. Most importantly, the undersigned asked whether all West Virginia class members, who had fees fully reimbursed, would they in addition receive cash on the same basis as other national class members as indicated by Fairbanks' counsel and set forth in the claims form? Ms. Morris explained that because West Virginia class members had already received all of their fees reversed, these borrowers would receive differential treatment from other class members nationally. Assuming that the FTC is correct

(pursuant to the claims form the FTC administers the clam process), it was confusing to West Virginia borrowers to receive notices at the end of February that represented to them that they are going to receive redress for those fees. This confusion was further exacerbated because the undersigned had informed class members, based on representations from Fairbanks' counsel that called that they would indeed receive additional cash settlement.

15. Lucas Plaintiffs' good faith attempts to resolve objections.

On March 25, 2004, these issues were discussed in a conference with Curry Plaintiffs' counsel and FTC Counsel. FTC Counsel acknowledged the issues and indicated that the best solution would be to carve out the Lucas class from the release in the Curry settlement, and that she would recommend that to Fairbanks' counsel. The other issues raised by Lucas class, which are detailed below, were also discussed and counsel agreed to convey the objections to Fairbanks' counsel.

Curry and FTC counsel had conferred with Fairbanks' counsel, and then on April 2, 2004, informed Lucas Plaintiffs' counsel that as to a carve out part or all of Lucas class from Curry release, the FTC's proposals to eliminate the confusion for West Virginia borrowers was rejected by Fairbanks. Additionally Fairbanks would not agree to any concepts regarding the Lucas Plaintiffs objections concerning (a) the institutionalization of fees, or (b) provision for adding payments to end of contract period in appropriate cases (other than some general language saying that Fairbanks in its discretion may go beyond the requirements of servicing guidelines).

## III. DISCUSSION

A. **Objection #1:** The (b)(3) Class Relief Should Reverse All or an Equal Portion of Illegal Charges on the Accounts, Rather Than Provide a Claims Process Wherein the Least Sophisticated and Most Exploited Borrowers are Not Provided Any Relief.

The Curry proposed settlement provides reimbursement of exploitive fees to class members only after borrowers respond to the notice and participate in a claims process. This term of the settlement does not compensate the unsophisticated class members who cannot negotiate the claims process. By contrast, in the Lucas settlement, Fairbanks unilaterally reversed all illegal default and late fees. The relief in Lucas, as a result, was simple and uncomplicated. Whether the Curry relief for illegal fees is complete or partial, it should be equitable and not provide significant relief for the more sophisticated consumers and none for the least sophisticated consumers. Accordingly, the relief in Lucas (1) was accomplished in a very simple, manageable fashion; (2) was equitable to all class members; and (3) assured class members know what they are getting when they make decisions based on the notice. The Curry settlement, unfortunately, fails to meet these three fundamental goals.

Fairbanks-serviced loans are disproportionately exploitive predatory loans to unsophisticated homeowners. Included are borrowers that cannot read or write. The Curry settlement effectively denies relief nationally to all those unsophisticated borrowers that cannot reasonably participate in a claims form process because they do not comprehend the claims form, which they consider very confusing. The Curry settlement is inadequate for this large number of borrowers because it denies them what would be a much simpler method of providing relief for illegal charges – across the board reversal of all or part of the fees. More importantly, this mechanism would be far more equitable to the class as a whole. If the Curry settlement is approved, those borrowers that could not

understand the claims process would receive no benefit while others that do would receive a greater reimbursement.

This concern is borne out by the experiences of the undersigned in West Virginia. There was evidently great confusion among class members after receiving the Curry class settlement notice. Nationwide, borrowers are required to make decisions about protecting their legal rights, which involve their ability to effectively save their homes, based on confusing information. This Court should instead require Fairbanks to simply reverse the charges without the need for a claims process, thereby providing equitable relief to the entire class.

**B.     Objection #2: the (B)(2) Declaratory Class Relief Should Not Be Approved Because it Institutionalizes the Charging of Unnecessary Collection Fees in the Servicing Industry.**

In the Spring to Summer 2003, Fairbanks hired counsel formerly with FTC to negotiate the Curry settlement. After these negotiations Fairbanks declared numerous times that certain of its practices have been "blessed by the FTC." Meanwhile, on September 25, 2003. Senators Paul Sarbanes and Barbara Mikulski urged the FTC not to include in a settlement the details involving maximum allowable fees, stating that once maximum fees are declared in an order with the FTC, the entire industry could charge those fees at every available opportunity. The Senators expressed their concern to the FTC in a letter:

> fees for broker price opinions and periodic home inspections are quite controversial, and subject to be challenged under most state laws, regardless of the amount. These fees in particular should not receive any endorsement from the FTC.

(Ex. A.) The letter further urges caution to avoid the Order having the inadvertent effect of sanctioning foreclosure without exploration of other more appropriate responses to borrower temporary default (e.g., backending payments). (Ex. A.) However, the current Curry settlement fails

to address either of these concerns.  In anticipation of the Court approving the settlement, the financial servicing industry scheduled a conference ten days after the scheduled hearing to announce anticipated approval of the FTC sanctioned fees.  A pamphlet advertising "The Legal Guide to Mortgage Servicing" declares, "Senior government officials, mortgage servicing executives and top lending attorneys will provide expert legal, tactical and practical information on: . . . How to incorporate the Fairbanks guidelines into your client's servicing process."  The brochure sets forth various sessions such as "Learn Valuable Strategies from Industry Lenders – Ameriquest Mortgage Company, Bank of American, Fairbanks Capital Corporation, etc.," "Implementing post Fairbanks Processes for Charging Fees . . . ." (Ex. B.)  It is clear that the Senators' concerns are coming to life: the Curry settlement will indeed institutionalize the addition of exploitive charges to borrowers account, but not just by Fairbanks, but by every other servicer in the industry.

The impact of this provision alone, which institutionalizes the addition of hundreds of dollars over several month period to borrowers' accounts, cannot be underestimated.  What is at stake is the homes of many Americans.  Borrowers that live on a fixed income, which represent a large number of borrowers serviced by Fairbanks, would be unable to afford these additional fees.  These borrowers would be unnecessarily forced into foreclosures.

And the foreclosure wheels are further greased by the settlement's endorsement of Fairbanks' operational practices; the most severe shortcoming being that Fairbanks Operational Practices precludes the most common and needed alternative to foreclosure afforded by courts and lenders. to foreclosure under common law principles of equity – adding the payments to the end of the loan.  This Court should reject the settlement because it institutionalizes charges that were heretofore deemed exploitive.  Servicers should not be permitted to condition a family's ability to keep their

home on the payment of these exploitive fees and charges.

**C.     The West Virginia Class Certified in <u>Lucas</u> Should be Carved Out From the <u>Curry</u> Release.**

The miscommunication between the parties – whether it be unintentional or not – and the very circumstances of the <u>Lucas</u> and <u>Curry</u> settlements warrants a carve-out of the West Virginia borrowers in the <u>Curry</u> release. Setting aside the concerns about borrowers' comprehension or lack thereof of the notice and claims process, borrowers in West Virginia are understandably confused about what relief they can expect from the <u>Curry</u> settlement. First, West Virginia borrowers received the <u>Lucas</u> notice, which explained (based on representations by Fairbanks' counsel) that they would not have to choose between the <u>Lucas</u> or <u>Curry</u> settlements. Next, West Virginia borrowers received the <u>Curry</u> notice, which represented that certain damages for fees to their account would be paid. When confused borrowers contacted <u>Lucas</u> Plaintiffs' counsel, the undersigned informed them that they would indeed receive the cash equivalent of what borrowers received nationally. However, the FTC, who administers the claims process, has represented that West Virginia borrowers could not expect to receive the amounts represented in the <u>Curry</u> notice.

Given the confusing and contradicting information in the <u>Curry</u> notice, West Virginia borrowers cannot reasonably make informed decisions about opting in or out of the <u>Curry</u> settlement. It is apparent that West Virginia borrowers are unique nationally and therefore should be carved out of the <u>Curry</u> release. This Court therefore should reject the settlement for its failure to exclude West Virginia borrowers from the release.

### III. CONCLUSION

What is at stake if the <u>Curry</u> settlement is approved is the homes of thousands of Americans

whose home loans are serviced by Fairbanks and any other servicer that adopts the procedures "blessed by the FTC" in this settlement agreement. This Court should seriously question whether the settlement, which stands to exclude the least sophisticated and therefore most vulnerable of Fairbanks' borrowers from the settlement while at the same time waiving their legal rights to protect their home, is fair to all class members. At the very least, West Virginia borrowers, given the confusion resulting from the notices, should be excluded from the release.

By Counsel:

//S// Daniel F Hedges
Daniel F. Hedges (WV State Bar ID #1660)
Mountain State Justice, Inc.
922 Quarrier St., Ste. 525
Charleston, WV 25301
(304) 344-5564
(304) 344-3145 (facsimile)

//S// Jessica D Hedges
Jessica D. Hedges (BBO #645847)
Hrones & Garrity
Lewis Wharf Bay 232
Boston, MA 02110
(617) 227-4019

Dated: April 8, 2004