UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ALANNA L. CURRY *et al.*,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

Civil Action No. 03-10895-DPW

FAIRBANKS CAPITAL CORPORATION,

Defendant.

## FAIRBANKS' RESPONSE TO
## CERTAIN OBJECTIONS TO PROPOSED SETTLEMENT

The Court has scheduled a hearing for May 12, 2004, to consider whether to grant

final approval to the proposed settlement in this case. Defendant Fairbanks Capital Corp.

("Fairbanks") submits this response to certain of the objections that have been filed on or

before the April 9, 2004 deadline for submission of objections.[1]

### WEST VIRGINIA OBJECTORS

Three West Virginia objectors (Jack Overbaugh; Danny VanDale; Constance

VanDale) (the "West Virginia Objectors") are members of a separate class action involving

unique issues under West Virginia law, which has recently been settled in West Virginia state

court, styled Lucas, et al. v. Fairbanks Capital Corp., No. 03-C-0002 (Lincoln County Circuit

Court) ("Lucas"). One of the objectors, Jack Overbaugh, is a named class representative in

---

[1]     Attached hereto as Exhibit A is a chart summarizing the objections and communications submitted to
the Court. Fairbanks has not responded to each objection, but only to those as to which it believes Fairbanks can
add a useful perspective for the Court. Four objectors to the settlement (Jimmy T. Pegler, Charese Moreland,
Malcolm Scoon, and Colaine Curtis) do not appear on the class list, and therefore do not appear be members of

Lucas, and Daniel Hedges, Esq. represents both the Lucas class and the West Virginia Objectors.

The West Virginia Objectors' primary objection is that they and other West Virginia residents should be "carved out" of the Curry settlement class. This objection should be rejected for the reasons set forth below.

Before addressing the objection, however, a brief explanation of the Lucas case will provide context. Lucas was filed in January, 2003, and sought a statewide class action. Affidavit of Thomas M. Hefferon, Esq. Concerning the Lucas Case ("Hefferon Aff."), attached hereto as Exhibit B, at ¶ 7. The case concerned two chief issues, each of which was unique to West Virginia. First, the suit concerned whether Fairbanks violated West Virginia statutes in seeking to impose and collect certain charges in connection with a borrower default, primarily charges for brokers' price opinions, property inspections, collection costs, and attorneys' fees. Id. Second, plaintiffs contended that Fairbanks was not complying with West Virginia law in how it processed foreclosures under state law. Id.

While the litigation was long and complicated, the procedural history is largely irrelevant because the case has been settled. The settlement has two main components: monetary relief, in the form of forgiveness of certain fees and a cash payment to recompense violations of West Virginia debt collections statutes, and non-monetary relief, in the form of new procedures for state foreclosures and the agreed certification to the West Virginia Supreme Court of Appeals of questions of state foreclosure law. Id., at ¶ 8. The monetary settlement was preliminarily approved by the state court in December, 2003 and the non-

the class. Nonetheless, Fairbanks has, for the convenience of the Court, addressed two of the objections (Scoon and Curtis) in this brief.

2

monetary settlement was approved in January, 2004. Id., at ¶¶ 13, 14. Fairbanks did not admit liability.

### 1. No Basis Exists To Remove West Virginia Residents From This Settlement

The West Virginia Objectors assert that this Court should "carve-out" West Virginia residents from the settlement in this case.[2] Some West Virginians were members of the classes in both Lucas and Curry, and received notices that the Objectors contend contain "confusing and contradicting information," leaving those persons "confused about what relief they can expect from the Curry settlement." "Objection to Approval of Final Settlement" (April 8, 2004) ("West Virginia Objection") at 19. The objection is meritless for several reasons.

First, the West Virginia Objectors provide no evidence supporting their assertion that anyone was confused about their rights. They do not, for example, attach any affidavits or correspondence from West Virginia residents. Other than the West Virginia Objectors, no member of the Lucas class filed objections in this Court asserting that they were confused about the benefits they would receive in this settlement.[3] Finally, no members of the Lucas class filed objections in West Virginia state court alleging that they were confused about the notices they received. Hefferon Aff., at ¶ 18.

Second, the West Virginia Objectors are not well-positioned to complain about alleged confusion with respect to notices. The settlements were proceeding at roughly the same time, and Objectors' counsel was aware of each settlement. Given the fact that both settlements

---

2   The objection is somewhat unclear as to whether it seeks to "carve out" all West Virginia residents or just members of the Lucas class.

3   The West Virginia Objectors' claim of confusion consists of comments by Attorney Hedges that he received telephone calls about the two cases. Those calls were invited by Attorney Hedges, who recited in the Lucas notice that "[y]ou should consult . . . counsel relative to any Massachusetts settlement." It is, of course,

3

would be noticed at about the same time, it would have been only natural for the <u>Lucas</u> Notice to explain how the cases relate to each other. Yet, the <u>Lucas</u> Notice, as drafted by their counsel, did not even mention the <u>Curry</u> settlement. It was only after counsel for Fairbanks proposed language to alert the <u>Lucas</u> class about this settlement that anything was done in the <u>Lucas</u> Notice to explain the interplay of the two cases. <u>Id.</u>, at ¶ 17. The <u>Lucas</u> class, through their counsel, accepted only some of Fairbanks' suggested language, and then mailed the <u>Lucas</u> notices. <u>Id.</u>

Fairbanks believes it is hardly appropriate for the Objectors to complain now that people were somehow confused by a notice their own attorney wrote. To the extent any confusion arose because of the <u>Curry</u> Notice, it is also noteworthy that their counsel chose not to make any comments on the proposed form of <u>Curry</u> notice, filed with this Court and available on PACER for almost three months before mailing. <u>Id.</u>, at ¶ 11.

Third, the two Notices do not conflict and are not confusing. The notice sent to <u>Lucas</u> class members told them that they would receive a cash payment of a stated sum, plus a letter crediting or reversing certain fees Fairbanks earlier charged, and become the beneficiary of certain non-monetary relief. Class members in <u>Curry</u>, including some <u>Lucas</u> class members, received a notice with claim forms explaining that they would receive a proportionate share of the Redress Fund if they filed a claim, and other monetary benefits and structural relief. Then, the overlapping group received an explanation, in the <u>Lucas</u> notice, that discussed the two cases:

> You may also receive shortly information about a proposed
> settlement with Fairbanks in Massachusetts. <u>The settlement of</u>
> <u>this West Virginia case is in addition to any Massachusetts</u>

<hr>

ironic that the Objectors complain about confusion when their counsel previously recognized that some might need to seek guidance and invited them to contact him.

4

> settlement, and you do not have to choose between them. You
> should consult the notice and/or counsel relative to any
> Massachusetts settlement.

Id. at ¶ 17 (emphasis added). The Lucas notice cannot be more plain about the fact that the

Lucas benefits are additional benefits to those coming under Curry. This is not confusing, it

is clear.

It is telling, but not surprising, that the Objectors do not contend that the Lucas notice

was wrong. Class members were plainly told the truth – the Curry settlement is in addition to

the Lucas settlement. The Lucas settlement involves a small and discrete set of loan charges

that allegedly violated West Virginia law, while this action involves a large variety of charges

and numerous loan servicing practices. Unlike Curry, Lucas does not even address two of the

most significant alleged harms – late fees assessed when a payment was not late, and hazard

insurance that was purchased unnecessarily and charged to the borrower. Lucas provides

equitable relief with respect to the specific conduct at issue in that case, primarily involving

prosecuting foreclosures, while the settlement in this case provides wide scale changes to

Fairbanks' loan servicing practices through adoption of the Operational Practices and Default

Resolution Programs. Hefferon Aff., at ¶ 8.

To the extent Lucas class members did not receive a remedy in Lucas for conduct at

issue in this case, they will obtain additional relief through the Curry case. As the Lucas

Notice correctly stated, "[t]he settlement of [Lucas] is in addition to [Curry] and you do not

have to chose between them." There is no basis for a claim of confusion.

Fourth, there is no reason why, even if there were confusion, West Virginians should

be "carved out" of the benefits of the Curry settlement. Fairbanks was never asked to exclude

West Virginia residents from Curry. Hefferon Aff., at ¶ 19. And West Virginia residents do

not want to be excluded from the Curry settlement. They have overwhelmingly chosen to

stay in the Curry case and benefit from the settlement; only 0.16% (5 out of 3127), almost the same percentage as the entire class, have chosen to opt out and no one, other than the West Virginia Objectors, has objected. West Virginians who are part of the class in this case clearly have not expressed confusion about the settlement, and even if they had, the Objectors' suggest no authority or reason why such confusion would justify removing them from this settlement and the benefits they will receive. If there were confusion – and there was not – the remedy would be to send a clarifying notice to the persons who received a Lucas notice, not to exclude everyone from West Virginia from the Curry settlement.

Finally, any forced opt out of all West Virginia residents will present difficult issues as to how to treat them through the Redress Fund, as the Federal Trade Commission ("FTC") Settlement covers all 50 states. Claim forms already have been sent to West Virginia borrowers and more than 400 West Virginia borrowers have submitted claims. The West Virginia Objectors neglect to address any of the practical difficulties that a state-wide "carve out" would present to the remainder of these settlements.

## 2. The Court Should Disregard The Lengthy And Irrelevant Recitation Of Events About The Lucas Case

For reasons that are unclear, the West Virginia Objectors subject this Court to a ten-page history of settlement negotiations in the Lucas case as "Background" to the substantive objections they present. West Virginia Objection at 4-13. The Court will not be surprised to know that Fairbanks does not agree with much of that recitation, particularly as to whether or not the Lucas parties reached a settlement of the case in mid-2003. See "Memorandum of Law in Opposition to Plaintiff's Motion to Enforce Settlement," filed in Lucas, et al. v. Fairbanks Capital Corp., No. 03-CV-0061 (S.D. W.Va.) ("Lucas Federal Action") on July 14, 2003, available at http://pacer.wvsd.uscourts.gove/dc/ccgi-

6

bin/pacer250.pl?puid=01081270722 (docket entry 32). Indeed, the federal court that handled the Lucas case before remand and before whom the Motion to Enforce Settlement had been filed, found that a final and complete settlement had not been agreed upon. See also "Memorandum Order," filed in Lucas Federal Action on October 15, 2003 (docket entry 49). Fairbanks also strenuously objects to counsel's characterization of Fairbanks as having attempted to thwart the Lucas settlement by using this Court's injunction concerning competing litigation.[4]

The Court need not, and should not, attempt to unravel this history, because the recital has nothing to do with the three objections asserted by the West Virginia Objectors. How Lucas proceeded before it was settled does not resolve whether the Curry notice is confusing or whether West Virginia should be carved out (West Virginia Objection at 19 "Objection No. 3"); does not assist the Court in considering whether the Curry monetary remedy is adequate (Id. at 16-17 "Objection No. 1"); and does not bear upon the concerns raised about the sufficiency of the servicing practices relief contained in the Curry settlement (Id. at 17-19 "Objection No. 2"). Moreover, the circumstances of how the Lucas case proceeded are even irrelevant in Lucas, as that case is settled. While Fairbanks is happy to address this history if the Court desires, Fairbanks respectfully submits that this Court and this proceeding are not the time to further litigate the now-settled Lucas case.

---

4       In the days before the preliminary approval hearing, as reported at the preliminary approval hearing, counsel for Fairbanks and plaintiffs' counsel were attempting to gain Lucas Counsel's participation in the Curry settlement. Those contacts continued throughout December 2003, and ultimately resulted in the completed Lucas settlement in January 2004. If there was any confusion as to how the Curry injunction was referred to in a hearing in Lucas on December 8, 2003, any miscommunication was, as the West Virginia Objectors grudgingly concede, "inadvertent" – borne of that fact that the hearing did not involve the lawyers in Curry, and the hearings in each case happened on consecutive days and before the injunction had been signed by the Court.

## FULL REFUNDS FOR ALL CHARGES IS NOT FEASIBLE OR REQUIRED FOR THE SETTLEMENT TO BE FAIR AND ADEQUATE

Several individuals (the West Virginia Objectors; Malcolm Scoon; Gordon & Marcia Lupo; Linda Scott; Anthony & Doris Doughty; Mary Keys; Vanessa McGhee) object to the settlement because class members will not receive a full refund of all allegedly improper fees and charges incurred, or other harm suffered. The argument fails for three reasons.[5]

Most important, there is no evidence that there are "improper" charges that will not be fairly remedied by the settlement before the Court. An objection like this, without a factual basis, should be given no weight.

Even if there were "improper" fees and charges on some account or accounts, determining on a loan-specific level which specific fees and charges assessed were proper or improper poses considerable practical difficulty. Thus, the Objectors' demand that "all improper fees and charges be cancelled" is wholly impractical.

One example of this phenomenon concerns late charges. The Curry class asserts that Fairbanks had a practice of holding onto some timely-made payments until after the payment grace period expired, in order to increase company income from late fees. But Fairbanks' loan servicing system cannot establish which late charges resulted from such allegedly-held payments and which resulted from a borrower who actually made the payment late. "Affidavit of Brent Rasmussen" ("Rasmussen Aff."), attached as Exhibit B to Fairbanks' Submission Concerning Settlement, at ¶ 6. Similar challenges are presented because the

---

5    Ms. Scott, the Doughtys, Ms. Keys and Ms. McGhee have no right to complain about the settlement because their objections were filed late. See "Order Preliminarily Approving Settlement, Conditionally Certifying Class for Settlement Purposes, and with Respect to Notice, Settlement Hearing and Administration In Each Case" (Dec. 10, 2003) at ¶¶ 19, 21. Although Fernando & Carmen Zapater appeared to have filed an objection along similar grounds, apparently they did not intend to do so. See Letter from Allison I. Brown, Esq., Division of Financial Practices, FTC, to Mr. and Mrs. Zapater dated March 25, 2004 (confirming conversation with the Zapaters that they did not intend to object to the settlement), attached hereto as Exhibit C.

8

computerized loan system does not allow one easily to identify other charges as "improper." Id. at ¶¶ 6-8. See also "Affidavit of Kim A. Stevenson" ("Stevenson Aff."), attached hereto as Exhibit E, at ¶ 4. Even an individual, account-level review might not ultimately reveal the propriety of a particular charge. Rasmussen Aff., at ¶ 9.

Because of these circumstances, and others, the settlement created a Redress Fund with some targeted account-level relief. Accepting concrete benefits for class members now (rather than waiting for potential benefits that may or may not materialize at some uncertain point in the future) strikes an entirely appropriate balance that benefits this class and makes a settlement manageable. See, e.g., Duhaime v. John Hancock Mutual Life Insurance Co., 177 F.R.D. 54, 68 (D. Mass. 1997).

In any event, the record is clear that Fairbanks was in precarious financial circumstances in 2003, that Fairbanks had (and has) only limited financial resources to contribute toward a settlement of the class action lawsuits, and that Fairbanks had (and has) substantial defenses to the class claims.[6] It is axiomatic, but worth repeating, that a class settlement is not inadequate or unfair simply because it does not provide the full remedy that plaintiffs theoretically could have recovered if they had prevailed at trial and been able to collect on any judgment. See In re Mexico Money Transfer Litigation, 164 F. Supp. 2d 1002, 1028 (N.D. Ill. 2000) (in assessing settlement proposal, little weight is given to objectors who assert that they are entitled to 100% recovery). By their nature, class action settlements are compromises of disputed claims. In re NASDAQ Market-Makers Antitrust Litigation, 187

---

[6]     Limits on Fairbanks' financial wherewithal make this relief (even if it was justified, which it is not) impractical. Account write-offs are not mere bookkeeping entries, but instead would directly affect the company's balance sheet and financial health. Affidavit of Barbara K. Wing ("Wing Aff.") attached hereto as Exhibit D, ¶ 5.

F.R.D. 465, 476-77 (S.D.N.Y. 1998). Objectors ignore this fact, and the risks that plaintiffs would not have prevailed. See Fairbanks' Submission Concerning Settlement at 4-7.

## FAIRBANKS' FUTURE CONDUCT WILL CHANGE SIGNIFICANTLY

Two class members (Jack Hosterman; Laurel Crosetto) objected to the settlement based on their belief that Fairbanks will continue illegal or improper conduct that gave rise to the settlement. This objection is wrong.

Hosterman and Crosetto make no mention of the Operational Practices ("OP") Fairbanks has agreed to adopt as part of the settlement. Under the OP, Fairbanks has agreed to revamp numerous aspects of its loan servicing practices, and will seek to improve customer service, post payments timely to loan accounts, resolve borrower disputes quickly, and place insurance only when necessary. These objectors also make no mention of the Default Resolution Program ("DRP"), in which Fairbanks will substantially revise its default practices to seek loan resolutions with the borrower and proceed to foreclosure only under certain circumstances. Finally, these objectors do not mention Fairbanks' parallel settlement with the FTC. There, Fairbanks is subject to detailed restrictions in its loan servicing operations in a variety of areas, including posting loan payments, imposing lender placed insurance, charging of fees, loan collection activities, reporting credit information, responding to consumer requests for information, resolving consumer disputes, loan workouts, and foreclosures. "Order Preliminarily Approving Stipulated Final Judgment and Order as to Fairbanks Capital Corp. and Fairbanks Capital Holding Corp." (Nov. 21, 2003) ("FTC Order") at Sections I-XV.

Structural relief that remedies the practices that form the basis of a lawsuit are routinely recognized as providing substantial benefits in a settlement. Hanlon v. Chrysler

Corp., 150 F.3d 1011, 1027 (9th Cir. 1998); In re Mexico Money Transfer Litigation, 164 F.

Supp. 2d 1002, 1011 (N.D. Ill. 2000); Diaz v. Hillsborough County Hospital Auth., 2000 U.S.

Dist. Lexis, 14061, at *9-10 (M.D. Fla. Aug. 7, 2000); Linney v. Cellular Alaska Partnership,

1997 WL 450064, at *4 (N.D. Cal. July 18, 1997), aff'd, 157 F.3d 1234 (9th Cir. 1998). That

relief is a central part of the settlement, and, therefore, the Hosterman and Crosetto objections

should be overruled.

## OBJECTIONS THAT THERE IS NO REMEDY FOR IMPAIRED CREDIT SHOULD BE OVERRULED

Several individuals (Timothy Stites; Hosterman; Marcus Cleveland; Colaine Curtis)

object to the settlement because they believe class members do not obtain relief for impaired

credit that they believe resulted from Fairbanks' actions. This objection is not well-founded.

First, these objectors make no mention of Section XIV of the FTC Order. That

provision required Fairbanks to re-classify certain delinquent loans as current; change its

records to remove the prior record of delinquency; report to consumer reporting agencies that

the account is considered current and that the prior record of delinquency is considered

inaccurate; and notify borrowers of the actions taken. These procedures provide substantial

relief to the affected borrowers.

Moreover, Federal law provides borrowers with remedies to address any credit

problems that they believe Fairbanks may have caused. Under the Fair Credit Reporting Act

("FCRA"), a consumer can dispute the accuracy of any item in his or her credit report, and is

entitled to have any inaccuracies or incompleteness corrected. 15 U.S.C. § 1681i.[7]

---

[7]      The Settlement does not impair the right to seek credit report correction. The would not affect
consumers' rights in the event Fairbanks fails in the future to respond appropriately to a request for credit
correction.

There is a good reason the settlement does not provide any additional relief for allegedly impaired credit, because whether actions by Fairbanks impaired any class member's credit is difficult to determine without individual account level review. Fairbanks services portfolios of "sub-prime" loans, which are made to borrowers whose credit was already somewhat blemished at the time they obtained their loans. Many of those borrowers may have encountered further financial difficulty after they obtained their loans and before Fairbanks began servicing the loans, further impairing their credit status. Understandably, it would be close to impossible to provide some wholesale relief somehow to repair class members' credit. As discussed above, it can be difficult to determine whether particular charges were "improper" or not, and so it would be difficult to identify those persons whose credit was impaired by Fairbanks' conduct. Accordingly, the federal statutory remedy under FCRA is the only appropriate relief for alleged credit impairment.

For all these reasons, the Court should overrule this objection.

## FAIRBANKS USED A RIGOROUS PROCESS TO GENERATE CLAIM FORM AMOUNTS

One borrower (Stephen Weinstein) objected to the settlement because he believes that the amount of fees and costs listed on their claim forms is inaccurate. Given that over 700,000 class members received claim forms, the fact that only one objection raised this issue indicates no systematic problem occurred in generating claim forms for class members, and that this objection should be rejected.

For the Court's information, Fairbanks would also note that it engaged in an extensive process to identify amounts to be included on class members' claim forms. Working in consultation with the FTC, Fairbanks identified various codes contained on its mortgage servicing system that corresponded with certain practices the class placed at issue in this case.

12

Fairbanks then generated a list of all class members whose accounts showed the presence of one or more of those codes, which became the list of class members. For each such class member, Fairbanks then computed the amount to be inserted on the borrower's claim form by totaling all fees and charges that Fairbanks assessed during the class period (not of waivers) with respect to the identified codes. Affidavit of Brent Rasmussen, dated March 18, 2004 (submitted with Plaintiffs' Memorandum in Support of Motion for Final Approval of Settlement) ¶¶ 7-17. This systematic process enabled Fairbanks to generate claim form information for each class member in the time between the preliminary approval of the settlement in mid-December 2003 and the mailing of notices in late-February 2004. Fairbanks believes that there are no systematic problems with the data, though data entry mistake on individual loans might have occurred from time to time. Deposition of Brent K. Rasmussen, taken March 31, 2004, at 17, attached hereto as Exhibit F.

Accordingly, given that Fairbanks employed a rigorous system to gather the borrower data required to generate the class list and claim forms, and because there was no systematic problem with that data, this objection should be overruled.

## OBJECTIONS THAT THE RELEASE IS TOO BROAD ARE UNFOUNDED

Several objectors complain that the release in the Settlement Agreement is too broad – either because it releases unknown rights (Keys; Corbin) or parties other than Fairbanks (Corbin) or because the release is effective as to all class members, including those who do not file a claim form (Keys). The Court should reject these objections because the release is entirely reasonable and appropriate and is a necessary element to any settlement.

It is, of course, fundamental that the purpose of a settlement, from the standpoint of a defendant, is to obtain litigation peace. The release (among other settlement features) secures

13

that peace. It must be comprehensive enough to prevent all further disputes about the subject matter settled, and drafted so as to prevent inventive and enterprising plaintiffs from resurrecting the settled matters under the guise of some new theory or by suing some new target. A release that does not secure peace for a defendant would be unreasonable to expect, and no defendant would agree to one.

The release in this settlement obtains peace for Fairbanks against further litigation, and so is reasonable. In general terms, it is broadly written so as to release, *inter alia*, all claims concerning Fairbanks' servicing of loans that were in payment or other default or had been treated as having been in default (thereby addressing, for example, allegedly improper late fees, corporate advances, or hazard insurance charges, and foreclosure and collection activity) and all claims concerning the transactions or occurrences alleged in the operative complaint. Settlement Agreement, I. 30 ("Released Claims"). It releases such claims no matter what the legal theory asserted. The release tracks the alleged misconduct, and so is entirely appropriate in scope. See City Partnership Co. v. Atlantic Acquisition Ltd. Partnership, 100 F.3d 1041, 1044 (1st Cir. 1996) (permitting a broad release of claims based on overlapping factual predicates "in order to achieve a comprehensive settlement that would prevent relitigation of settled questions"); In re Corrugated Container Antitrust Litig., 643 F.2d 195, 221 (5th Cir. 1981) ("The weight of authority establishes that . . . a court may release . . . claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint.").

While the release benefits persons and entities other than Fairbanks and its employees, this is an ordinary and reasonable term that is essential to the litigation peace in any settlement. In re Prudential Ins. Co. of Am. Sales Prac. Litig., 962 F. Supp. 450, 558-59 (D.

14

N.J. 1997) (approving a class settlement). See also, e.g., Vaughn v. General Foods Corp., 797
F.2d 1403, 1416 (7th Cir. 1986); In re Am. Family Enter., 256 B.R. 377, 428 (D. N.J. 2000).
Among those released are Fairbanks' shareholders, those for whom Fairbanks services loans,
those (such as attorneys and vendors) whom Fairbanks used in connection with servicing
loans, and those who service loans Fairbanks previously serviced. The claims being released
with respect to these entities would be derivative of the claims against Fairbanks, at least in
most instances, or closely related to them. A release that benefits these entities is necessary
because, without it, class members might attempt to sue those releasees to seek a remedy for
Fairbanks' conduct. In turn, Fairbanks would be subject to being brought back into litigation
as a third-party, or independently sued by those persons and entities for indemnity,
contribution or the like.[8] Further litigation also would, once again, subject Fairbanks to
overwhelming discovery and business disruption. The result is the antithesis of litigation
peace, because Fairbanks would be dragged into the very cases – and many new ones – that
this settlement is intended to avoid. Permitting claims against Fairbanks' investors, alleged
agents, and other related entities would defeat the purpose of this settlement, which is to
resolve class members' claims related to Fairbanks' servicing practices.

The release is also appropriate in extending to all class members, whether or not a
particular class member filed a claim form and obtained a payment. Reppert v. Marvin
Lumber and Cedar Co., Inc., 359 F.3d 53, 57-58 (1st. Cir. 2004) ("After such appropriate
notice is given, if the absent class members fail to opt out of the class action, such members
will be bound by the court's actions, including settlement and judgment . . ."). Every member
received a benefit because every member had an opportunity to file a claim, and was warned

---

[8]     A release for Fairbanks' shareholders is justified independently by the fact that they provided financial
assistance to Fairbanks that was necessary to the settlement. Wing Aff., ¶ 4.

15

that the release would be effective whether he or she did so, unless he or she opted out. About one-third of class members filed claims. To limit the release to those claimants would, effectively, opt out two-thirds of the class. A release that is so narrow would be unreasonable.[9]

Objector Corbin raises a related point that should also be rejected, when she professes not to "understand" why all class members give a release "when the FTC only agreed to releasing class members who have filed a claim." Corbin Objection at 4. Even if Corbin was correct, her objection is not well founded because she mischaracterizes the two agreements – the Curry settlement and the FTC consent order – as separate, and not dependent. Fairbanks negotiated and settled the class actions and the FTC investigation simultaneously, and the settlements are contingent upon one another, because Fairbanks needed to resolve both sets of matters in order to survive as an ongoing business. It did not, as Corbin suggests, settle with FTC for one set of releases and then get a broader set of releases from the class settlement. Instead, it settled both matters together, with a common Redress Fund and other overlapping features. The releases from all class members (who do not opt out of the settlement) is a vital and necessary element to the complete litigation peace Fairbanks sought and was necessary to any agreement.

---

9    The suggestion that the release ought to extend only to claimants, because only they get a benefit, additionally ignores the substantial value to the operational and other practice changes in the settlement.

16

# CONCLUSION

For these reasons, Fairbanks respectfully requests that the Court reject the objections discussed above (as well as other objections filed) and grant final approval to the parties' proposed settlement.

Respectfully submitted,


/s/ Brooks R. Brown
_____
Thomas M. Hefferon (BBO #548289)
Joseph F. Yenouskas (*pro hac vice*)
GOODWIN PROCTER LLP
1717 Pennsylvania Avenue, N.W.
Suite 500
Washington, D.C. 20006
(202) 974-1000

Brooks R. Brown (BBO # 634144)
GOODWIN PROCTER LLP
Exchange Place
Boston MA 02109
(617) 570-1000

Counsel for Defendant
Fairbanks Capital Corp.

Dated: May 3, 2004

LIBW/1100701.4

## CERTIFICATE OF SERVICE

I, Brooks R. Brown, do hereby certify under the penalties of perjury, that on May 3, 2004, I arranged for the service by ECF Filing and U.S. Mail, postage prepaid, a copy of the foregoing on the following counsel of record:

> Gary Klein, Esq.
> John Roddy, Esq.
> Grant, Klein & Roddy
> 727 Atlantic Avenue, 2nd Floor
> Boston, MA 02111


/s/ Brooks R. Brown
Brooks R. Brown


Additional Plaintiffs' counsel and persons were served by first class mail on May 4, 2004 at the

addresses on the attached list.

## Service List

Michael L. Kirby
Post Kirby Noonan & Sweat LLP
America Plaza, Suite 1100
600 West Broadway
San Diego, CA 92101

Mike Peacock
John A. Yanchunis
James, Hoyer, Newcomer & Smiljanich, P.A.
One Urban Centre, Suite 550
4830 West Kennedy Boulevard
Tampa, FL 33609

Alan M. White
Community Legal Services, Inc.
Law Center North Central
3638 North Broad Street
Philadelphia PA 19140

Daniel A. Edelman
Cathy Combs
Edelman, Combs & Latturner
120 South LaSalle Street, 18th Floor
Chicago, IL 60603

Mila F. Bartos
Finkelstein, Thompson, & Loughran
The Duvall Foundry 1050 30th Street, N.W.
Washington, D.C. 20007

Marian P. Rosner
Wolf Popper LLP
845 Third Avenue
New York, New York 10022

C. Neal Pope
Teresa Tomlinson
Pope, McGlamry, Kilpatrick, Morrison & Norwood, LLP
1037 Front Avenue
P.O. Box 2128
Columbus, GA 31902-2128

Drake Buckman
Buckman & Buckman, P.A.
1800 Second Street, Suite 715
Sarasota, FL 34236

Dayle G. Seidel
Seidel & McGory, P.A.
2901 W. Busch Blvd, Ste. 608
Tampa, FL 33618

Ervin Brown, II
Handler & Brown, P.L.L.C.
1014 West Fifth Street
Winston-Salem, NC 27101

Marc H. Edelson
Hoffman & Edelson, LLC
45 West Court Street
Doylestown, PA 18901

Ira Neil Richards
Trujillo, Rodriguez & Richards, LLC
The Penthouse
226 W. Rittenhouse Square
Philadelphia, PA 19103

Roberta D. Liebenberg
Fine, Kaplan & Black
A Restricted Professional Company
23rd Floor, 1845 Walnut Street
Philadelphia, PA 19103

Tod Aronovitz
Aronovitz Trial Lawyers
150 W. Flagler Street
Suite 2700, Museum Tower
Miami, FL 33130

Mark A. Chavez
Chavez & Gertler, LLP
42 Miller Avenue
Mill Valley, CA 94941

Lawrence D. Goodman
John Devine
Devine Goodman Pallot & Wells, P.A.
777 Brickell Avenue, Suite 850
Miami, FL 33131

Kevin C. Schoenberger, APLC
650 Poydras Street
Suite 2100 – Poydras Center
New Orleans, LA 70130

E. Powell Miller
Miller Shea, PC
1301 West Long Lake Road, Suite 135
Troy, MI 48098

David Olshan
Nevada Fair Housing Center, Inc.
3380 West Sahara, Suite 150
Las Vegas, NV 89102

Elizabeth Brancart
Brancart & Brancart
Post Office Box 686
Pescadero, CA 94060

Lance A. Raphael
The Consumer Advocacy Center, P.C.
25 East Washington Suite 1805
Chicago, IL 60602

Scott C. Borison
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick MD 21703

Michael D. Donovan
David Searles
Donovan Searles, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103

Brian R. Mildenberg
Mildenberg and Stalbaum, LLC
1616 Walnut Street, Suite 1010
Philadelphia, PA 19103

Andrew S. Kierstead
1001 SW Fifth Ave. Suite 1100
Portland, OR 97204

Andrew B. Spark
LawServ, Chartered
2033 Main St., Ste. 106
Sarasota, FL 34237

Stuart T. Rossman
John Rao
National Consumer Law Center
77 Summer Street, 10th floor
Boston, Massachusetts 02110

Matthew Brownfield
640 Community Law Center
215 East Ninth Street
Cincinnati, Ohio 45202

Jessica D. Hedges
Hrones & Garrity
Lewis Wharf Bay 232
Boston, Massachusetts 02110

Daniel F. Hedges
Mountain State Justice, Inc.
922 Quarrier Street, Suite 525
Charleston, WV 25301

Anthony Rollo, Esq.
Stephen W. Rider, Esq.
McGlinchey Stafford, PLLC
643 Magazine Street
New Orleans, LA 70130-0643

Nicholas A. Felici
Feinberg & Felici
127 Cambridge Street
Burlington, MA 01803

Gary Cook, Esq.
Darryl E. Pittman, Esq.
Pittman, Alexander, Cook & Associates
2940 Noble Road, Suite 202
Cleveland Heights, OH 44121

John J. Pentz
736 Boston Post Road
Sudbury, MA 01776

Rory A. Valas
Valas and Associates, P.C.
250 Summer Street
Boston, MA 02210

Brenda Manson
865 Herron Drive
Waterloo, WI 53594

Malcolm Scoon, M.D.
120-04 222nd Street
Cambria Heights, NY 11411-2020

Colaine Curtis/Marcus Cleveland
2113 Culpepper Lane
Farmington, NM 87401

Gordon Lupo
347 Gladwin Avenue
Clawson, MI 48017-2206

Fernando Zapater
1195 Marseilles Drive, #5
Miami Beach, FL 33141

Laurel Crosetto
1268 South Geiger Street
Tacoma, WA 98465-1523

Jack Hosterman
3210 N.E. 9th Street
Ocala, FL 34470

Linda Latorre
8301 Gale Road, S.W.
Hebron, OH 43025

Richard Hubney
326 E. Lincoln
Onarga, IL 60955

Timothy R. Stites
928 S. 18th Street
Manitowoc, WI 54220

Jen-Shenn Song
807 S. Severgn Drive
Exton, PA 19341

Fernando Hernandez
532 West Street, #8
Lockport, IL 60441

Levi Butler
1870 New Hope Road, S.W.
Atlanta, GA 30331

Wanda Thompson-Goff
18 West 125th 63rd Street, #208A
Westmont, Il 60651

Patricia A. Brooks
204-C Highland Blvd.
Burn Brae
New Castle, DE 19720

Pauline Rowl
P.O. Box 222022
Charlotte, NC 28222

Carol J. Henry
19721 St. Louis Street
Detroit, MI 48234

John W. Rector
8216 Wooster Pike, #E
Cincinnati, OH 45227

Ara Robinson
207 East Eight Street
Michigan City, Indiana

Kimberly and Patrick Maher
120 Route 96
Geneva, New York 14456

T. William Veach
3826 Atlanta Road
Smyrna, GA 30080-5936