UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

FAIRBANKS CAPITAL CORPORATION and
FAIRBANKS CAPITAL HOLDING CORP.,

        Defendants.

Civil Action No. 03-12219-DPW

---

ALANNA L. CURRY, *et al.*,
individually and on behalf of all others
similarly situated,

        Plaintiffs,

    v.

FAIRBANKS CAPITAL CORPORATION,

        Defendant.

Civil Action No. 03-10895-DPW

---

## PLAINTIFFS' OMNIBUS RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF SETTLEMENT

### I. INTRODUCTION[1]

    This is a comprehensive and integrated settlement of 30 class actions.  It provides more

than $47,000,000 dollars in relief to the class, together with comprehensive practice changes

designed to reform Fairbanks' mortgage servicing business.  It was negotiated not just by highly

---

[1] Because this is an omnibus response to all of the objections filed to this settlement, plaintiffs
seek leave, if such is required, to submit this memorandum consisting of more than 20 pages.

experienced class counsel, but also by the attorneys at the Federal Trade Commission ("FTC"), an agency charged with addressing marketplace abuses affecting consumers.

There are approximately 236,000 filed claims. See Declaration of Patricia Foley ("Foley Decl."), ¶ 13 filed separately. The fact that so many class members seek settlement benefits is a powerful statement that the settlement is widely regarded by its beneficiaries as fair and reasonable.

In contrast, only 34 class members (just 0.004% of the class) have objected to the settlement. Only four of the objections were filed by attorneys. 1100 class members have excluded themselves from the settlement, representing just 0.15% of the class. Foley Decl., at Exh. C. The small percentage of objections and exclusions strongly supports a conclusion that the settlement is fair and reasonable. Bussie v. Allmerica Financial Corporation, 50 F.Supp.2d 59, 77 (D. Mass. 1999). See also Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1178 (9th Cir. 1977); City of Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974).

A summary of objections and their counsel (if any) is attached as Exhibit 1.  In an abundance of caution, Counsel is treating 17 pieces of filed correspondence received from 20 unrepresented individuals as objections to the settlement, even though some of the correspondence is not denominated "objection."

The objectors, individually and as a group, provide no factual or legal support for their objections. Each should be overruled and the settlement should be allowed to go forward.

Plaintiffs address the merits of the settlement in their moving papers in connection with final approval.  They ask that the Court consider the following additional arguments in response to the filed objections.

## II. THE SETTLEMENT BENEFITS ARE EXCELLENT, PARTICULARLY IN LIGHT OF FAIRBANKS' FINANCIAL CONDITION.

The benefits of the settlement are described in the Settlement Agreement and Release and summarized in the Plaintiffs' Memorandum in Support of Final Approval of Settlement. That Memorandum also summarizes the standard applicable to judicial approval of class action settlement agreements. Those summaries are incorporated herein and will not be repeated.

Several objectors (including many of those filing pro se) contend that the settlement does not provide adequate relief. This objection, while understandable, is not a ground for disapproving a settlement. As one court has explained,

> settlement is by nature a compromise between the maximum possible recovery and the inherent risks of litigation. "The test is whether the settlement is adequate and reasonable and not whether a better settlement is conceivable." . . .

In re Warfarin Sodium Antitrust Litigation, 212 F.R.D. 231, 258 (D.Del. 2002) (citation omitted). Courts have long recognized that a "court [should not] make the proponents of the agreement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." Stewart v. Rubin, 948 F. Supp. 1077, 1087 (D. D.C. 1996). See also, e.g., Milstein v. Werner, 57 F.R.D. 515, 524-25 (S.D.N.Y. 1972); Pigford v. Glickman, 185 F.R.D. 82, 103 (D.D.C. 1999).

Not a single objector has presented any evidence to suggest that a litigated outcome would be better for the class as a whole than the instant Settlement. Nor has a single objector addressed the time and risk involved in litigating any class claim through trial and appeal. Indeed, the litigation history of the settled cases indicates that Fairbanks would have continued to employ highly qualified defense counsel to raise every possible procedural and substantive

hurdle to judgment for the plaintiffs on the merits.  See Joint Declaration of Counsel ("Joint

Decl."), ¶¶ 8 to 35.

Moreover, the objectors overlook that there is more than $47,000,000 worth of economic

relief under the settlement.[2]  This is a remarkable result, particularly in light of the Fairbanks'

thoroughly investigated financial difficulties.  These difficulties were likely to lead to bankruptcy

or business termination if these 30 class action cases had not been resolved. *See* Declaration of

Jeffrey A. Johnson, C.P.A. ("Johnson Decl.") [Docket No. 57]; Declaration of Barbara K. Wing

("Wing Decl.") at ¶ 4; Joint Decl. at ¶ 49; Federal Trade Commission's Memorandum Regarding

the Fairbanks Settlement and Redress Program ("FTC Memorandum") at 3.  *See also In re*

*Painewebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 129 (S.D.N.Y.1997), *aff'd,* 117 F.3d 721 (2d

Cir.1997) (the "prospect of a bankrupt judgment debtor down at the end of the road" must be

considered among counsels' reasons for accepting a class settlement).  In that event, class

members may have received little or nothing.[3]

The objectors also overlook the benefit to class members of the substantial practice

changes that will be implemented if the settlement is approved. Because many class members

have a continuing business relationship with Fairbanks, the practice changes will help to prevent

a renewal of prior difficulties.  Indeed, the Default Resolution Program ("DRP") (Appendix 1 to

the Settlement Agreement) is designed to help many class members preserve their homes.  This

protection can be far more valuable than a cash payment.  See Declaration of John Rao ("Rao

Decl.") at ¶ 4 [Docket No. 56].  If class members have to wait until the outcome of disputed

---

[2] The redress fund is $40 million and the reverse and reimburse program has a minimum value
of $7 million.  See Declaration of Kim A. Stevenson, ("Stevenson Decl."), at ¶ 6; Declaration of
Michael Donovan ("Donovan Decl."), at ¶ 7 [Docket No. 59].

[3] *See generally In re Lucent Technologies, Inc., Securities Litigation*, 2004 WL 434197 (D.N.J.,
2004) (defendant's financial ability to pay judgment at the end of litigation is an important factor
in determining whether a settlement is fair and reasonable); *Class Plaintiffs v. City of Seattle,*
955 F.2d 1268, 1276 (9th Cir. 1991), *cert. denied sub nom. Hoffer v. City of Seattle,* 506 U.S.
953 (1992) (defendant's ability to pay must be considered).

4

litigation to achieve a similar result, it is possible that many thousands will have already lost their homes.

### III. THE ATTORNEY-FILED OBJECTIONS MISCONSTRUE THE SETTLEMENT OR OTHERWISE LACK MERIT.

There are four attorney-filed objections in this matter. These are: 1) The "Ohio Objection" filed by the Ohio law firm Pittman, Alexander, Cook and Associates;[4] 2) The "West Virginia Objection" filed by Mountain State Justice Institute, Inc.; 3) the "Weinstein Objection" filed by John J. Pentz; and 4) the "Corbin Objection" filed by Valas and Associates, P.C. for a group of counsel including Paul S. Rothstein, Edward W. Cochran, Frank H. Tomlinson, and N. Albert Bachrach, Jr. The latter two objections were filed by a group of professional objectors who have compiled a track record of filing non-meritorious objections to dozens of class actions settlements across the country.

All of the objections lack merit. None of these objections provide the court with necessary factual or legal support. Indeed, none cite case law that supports their position.

### A. The Ohio Objectors Filed Their Objection Late. They Misunderstand Both the Settlement and the Standard for Settlement Approval.

The "Ohio objection" was received by class counsel bearing a court stamp of April 12, 2004. The objection is therefore late under the terms of this Court's preliminary approval order (objections due by April 9, 2004) and thus must be overruled on that basis alone. Weinberger v. Kendrick, 91 F.R.D. 494, 495-96 (S.D.N.Y. 1981), aff'd, 698 F.2d 61 (2nd Cir. 1982); Association For Disabled Americans, Inc. v. Amoco Oil Co., 211 F.R.D. 457, (S.D.Fla., 2002) (untimely objections rejected).

---

[4] The Ohio Objectors also seek leave to intervene and move for an extension of the deadline to opt out. Both motions were late and lack merit. The Defendant has prepared a brief in response to these motions that Plaintiffs support.

The objections are also unfounded. Counsel for the objectors filed a class action against the Defendant in Ohio not just after this settlement was announced and publicized, but indeed after this Court enjoined further litigation under the All Writs Act. Not surprisingly, they omit reference to their case, Doughty et al. v. Fairbanks Capital Corporation, et al. CV-04-520660 (Ct. Common Pleas, Cuyahoga Cty., Ohio) filed on January 28, 2004, from their objection. They do not even attempt to explain how they might achieve a better result in their recently filed litigation than the settlement here. Nor do they assert any basis on which the Court might conclude that the objectors' attorneys have superior judgment about the merits of the claims at issue than the FTC or the 42 law firms that are class counsel in this matter.

**1. The Ohio Objectors Complain of Numerous Provisions That Are Not in the Settlement, Strongly Suggesting a Frivolous or Bad Faith Objection.**

The Ohio objection reflects major gaps in understanding the settlement at issue. The objectors argue first that the "settlement states that former customers of Fairbanks will not receive compensation." Ohio Obj. at p. 8. There is no reference in the Objectors' memorandum for this proposition and it is flatly incorrect. Former customers of Fairbanks will share in the settlement proceeds on the same basis as existing customers. See Stipulation of Settlement at ¶ III.3, 4.

Likewise, several other provisions quoted or complained of do not appear in the settlement agreement for this case. See, e.g., quotation at p. 6; discussion of "one way gag order" at pp. 16-17; assertion that notice was included in "class members' card statement" at p. 18; assertion that the settlement agreement makes the total value of settlement and the class counsels' fees secret at p. 13-15. These provisions are not part of this settlement. It would appear that the Ohio Objectors borrowed a pleading from another case and failed to conform it to the facts here.

With one exception, 5  class counsel have not agreed to keep any aspect of the settlement secret or hidden.  See Ohio Obj. at pp. 12-13.   Again, the objectors fail to provide references to the settlement agreement provisions that they complain of.  There is no secrecy provision and no discovery materials have been sealed.

### 2. The Claims Procedure is Appropriate in the Circumstances of This Case

The Ohio objection contends further "if Fairbanks had set out to design a claims distribution process that would discourage class members from participating in the settlement, it could hardly have done a better job."  Ohio Obj. at p. 9.  This concern is belied, of course, by the 236,000 filed claims.

The Ohio objectors apparently believe that Fairbanks should have paid class members without requiring claims forms. Ohio Obj. at p. 9.  The West Virginia objectors and pro se objectors Kimberly and Patrick Maher ("the Mahers") make a similar objection.6  West Virginia Objection at pp. 16-17; Maher Objection at p. 4.  None of these objectors provides a shred of legal support for this notion, and it is without merit.  As one court recently noted in approving the settlement of a similar consumer class action over a similar objection:

> The requirement of an affirmation on the claim form, under penalty of perjury, from the Settlement Class Member seeking reimbursement for an Eligible Late Fee was appropriate and not objectionable. Notarization of claim forms is routinely required in class action settlements "to assure that the fund [is] share[d] among proper and deserving claimants," and here only an affirmation was required from Class Members. In re Armored Car Antitrust Litig., 1979 WL 1688 (N.D.Ga. Aug.13, 1979).

*Mangone v. First USA Bank, NA,* 206 F.R.D. 222, 235 (N.D. Ill. 2001).

---

[5] The only exception is that Class Counsel agreed not to disclose the "tipover" provision of the settlement. Settlement Agreement VI. 3.  A "tipover" is the number of requests for exclusion that provide the defendant with the option to withdraw from the settlement.  Counsel agreed not to disclose this number to prevent any organized effort to thwart the settlement by generating opt outs in excess of the tipover.  Perhaps as a result, the number of exclusions is below the tipover.

[6] The West Virginians' other objections are discussed in Part III. B.

The Court-approved claims forms for this case are very simple. The forms do not even require a declaration under the penalty of perjury, as in Mangone, but rather only an affirmation that the class member believes that he or she was affected by an improper practice. This was a reasonable choice of settlement procedures for this case, for several reasons. First, the settlement provides a limited pool of funds, payable in cash, and therefore it is a reasonable choice to direct the benefits of the settlement to those who are willing to make the modest effort of asserting that they have a valid claim.

Second, it is not the case that Class Counsel or the FTC could have used Fairbanks' records in every instance to sort out proper from improper charges. By way of example, one claim in the Consolidated and Amended Complaint is that Fairbanks delayed posting of class members' mortgage payments and thereby generated improper late charges. However, Class Counsel and the FTC acknowledge that many late charges imposed on class members were proper. There is no way to distinguish between proper and improper late charges in Fairbanks' records, because Fairbanks did not retain the postmark on every piece of mail received during the class period. The only basis on which the improper late charges can be refunded is an affirmation from the affected class member.

Third, because the class includes former as well as current borrowers, it is quite likely that some of the available addresses are outdated. Many borrowers' claims (such as those asserting unlawful prepayment penalties) arose precisely because they sold their homes and moved. Foreclosed borrowers are hard to locate. It would be a logistical nightmare to mail checks to all class members at their last known address. The claim form helps the administrator

verify the current address and prevents generation of a large undistributable residual fund in the form of uncashed checks.7

### 3. The Notice Is Also Appropriate in the Circumstances of the Case.

The Ohio objectors and others8 raise concerns about the Court approved notice that are legally or factually inaccurate. Contrary to the Ohio Objectors' position (Ohio Obj. pp. 13-15), the notice accurately states the amount of attorneys' fees to be requested and the value of the quantifiable benefits of the settlement to the class. Notice at ¶¶ 4, 11. Also contrary to the Ohio Objectors assertions (Ohio Obj. pp. 4, 6), the Settlement Agreement did require published notice, and notice was indeed published. Notice of Publication of Summary Notice [Docket No. 14].

The notice is otherwise more than adequate in all respects. It is well settled that class notices are "not required to provide a complete source of information." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999) (quotation marks, citation omitted). Notices are not required to identify the estimated number of class members, nor total damages. *In re Warfarin Sodium Antitrust Litigation*, *supra*, 212 F.R.D. at 253. *See also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard'" (citation omitted)).

The notice here exceeds the standards set by applicable caselaw. It was drafted and approved in a highly readable "question and answer" format. The notice accurately describes the lawsuits, ¶2; the class, ¶3; the settlement benefits including the precise amount ($40 million) of

---

7 The West Virginia objectors appear to prefer account credits to cash for existing borrowers. West Virginia Obj. at p. 16. Class counsel and the FTC believe that most class members prefer cash. Indeed, some class members have loans that have been charged off. Account credits to those borrowers would have no real economic value. Of course, those class members who would prefer an account credit are free to use the cash they receive to pay down their loans.

the benefits that could be quantified together with a full description of the reverse and reimburse program, ¶ 4; the distribution plan, ¶ 5; the proposal for class counsel compensation and named plaintiff relief, ¶11; the release, ¶ 12; how to submit a claim form, ¶6; the right to opt out, ¶7; and the right to object, ¶8. The relevant dates are restated and highlighted in bold print at ¶ 15. The additional information the objectors request is not required by Rule 23(c) and most of it, if offered, would only have served to confuse as many class members as it helped.

### 4. The Scope of the Release is Appropriate

The Ohio objectors and others[9] also object, without supporting authority, to the scope of the release. (Ohio Obj., p. 8) This objection also lacks merit.

In general, a release exchanged for the benefits received in a class action settlement may properly release "not only those claims alleged in the complaint, but also a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992) (internal citation, quotation marks, italics omitted). *See also In re Grimes v. Vitalink Communications Corp.*, 17 F.3d 1553, 1563 (3rd Cir. 1994). Here, the parties are settling more than 30 class actions alleging myriad claims. Under the applicable legal standard, when considered in light of the whole settlement, and in conjunction with the opt-out and exclusion provisions, the release here is fair, adequately described in the notice, and appropriately limited in scope.

First, the Notice to the class, approved by this Court, expressly states that the settlement will release Defendant from claims related solely to Fairbanks' servicing practices and it describes other parties who will be released for these claims. Notice at ¶ 12. The notice also

---

[8] The West Virginia objectors raise issues about the class notice superficially at p. 2 as does the Corbin objection at p. 5. The Mahers also raise this objection.

[9] The Corbin objection raises this issue cursorily at page 5.

states that this settlement allows class members to opt out of the settlement and pursue their own claims. Notice at ¶ 7. If class members were troubled by the scope of the release, they had the opportunity to opt out, and thereby to avoid the release and preserve their claims. This has simply not occurred to any great degree. Indeed, of the more than 750,000 class members who were mailed notice, only 1100 elected to opt out. *See* Foley Decl., at Exh. C. This represents just 0.15% of the class.

Second, to the extent that objectors complain that the release is unclear or overbroad, they are simply incorrect. To summarize, the released claims are, by the terms of the agreement, limited to claims in connection with the transactions or occurrences alleged in the Consolidated and Amended Class Action Complaint or which are related to Fairbanks servicing activities in connection with a loan in default or treated by Fairbanks as in default. These are the types of claims that were pled or investigated, or which are based on the same factual predicate, as those in at least one of the thirty class action cases that are being settled here.

The released parties are also expressly delineated. No party, other than Fairbanks, is released for its own conduct. Settlement Agreement, pp. 12-13; § 30. Released parties other than Fairbanks get a release applicable only to Fairbanks' servicing-related activities. *See also* Settlement Agreement, p. 13; § 31 ("Nothing in the definition of released claims shall prevent a Settlement Class member from seeking relief or pursuing a claim that does not arise out of or in connection with Fairbanks' Servicing on a Serviced Loan.") This protects, for example, claims against a lender (that later hired Fairbanks as a servicer) that are grounded in the origination of plaintiffs' loans.

The fact that the release includes other entities for their liability for Fairbanks' servicing-related conduct is a necessary function of the bargained for relief. Without this provision, claims against these other entities could potentially eviscerate Fairbanks' release, as Fairbanks might

then be subject to claims from its agents and vendors for contribution, indemnification, and the like.

Finally, there are several important exceptions to the release. First, a class member retains the right to use any and all claims and defenses in response to a judicial or non-judicial foreclosure. Settlement Agreement, p. 13; § 31(a). This is true whether or not a class member obtains benefits under the settlement. *Id.* This will allow class members who are in default to raise defenses and claims necessary to protect their homes. Additionally, class members retain their right to obtain mortgage information from Fairbanks under applicable federal law and to dispute it, if appropriate. *Id.*at § 31(b). *See* 12 U.S.C. § 2605(e). This will allow class members to challenge fees that may improperly remain pending on their accounts

### 5. The Attorneys' Fees Requested Are Both Fully Disclosed and Appropriate in the Circumstance.

The Ohio objectors assert repeatedly that there is a conspiracy in the settlement to hide "excessive" attorneys' fees. (Ohio Objection at pp. 13-16). For the reasons set forth more fully in the Plaintiffs' Memorandum in Support of Attorneys' Fees, which is incorporated herein, the fees the parties agreed to here are fair and reasonable. *See also* Declaration of Alba Conte ("Conte Decl."), at ¶¶ 35-43 [Docket No. 55]. Moreover, the fee agreement between the parties was fully described in the Settlement Agreement at II. C. 5 and clearly and conspicuously disclosed in the Class Notice at ¶ 11.

### 6. The Ohio Objectors Other Objections Are Equally Non-Meritorious.

Class counsel did not agree to a gag order as asserted in the Ohio Objection at pp. 3, 16. However, there is no obligation in a settlement of this type to affirmatively seek publicity.

Class counsel acknowledges agreeing not to assist or represent individuals who opt out, unless counsel had filed a preexisting individual case. Ohio Objection at p. 18-19. Settlement Agreement, ¶V.6. This is a common and appropriate provision in a class action settlement.

Indeed, such representation of individuals who opt out, if it were undertaken, might create a conflict of interest with Counsels' obligation to protect the interests of the class.[10] Fairbanks has limited resources, and significant successful claims by individuals who opt out might undermine the settlement. Nevertheless, contrary to the assertions of the Ohio Objectors, Counsel did provide accurate information about the settlement to everyone who inquired – many hundreds of class members. This included information about the choice to opt out. Joint Decl., ¶ 65.

### B. The West Virginia Objection is Misinformed and Unsupported.

The "West Virginia objection," by Jack Overbaugh and the Van Dales, etc. (collectively the "West Virginia Objectors"), was filed on their behalf by an attorney who contemporaneously settled a class action with Fairbanks on behalf of certain West Virginia borrowers based on unique provisions of West Virginia law. The two settlements are not competing, but rather are complementary, in that borrowers in West Virginia are entitled to relief in both settlements. *See* FTC Memorandum at p. 13, n.10. It is difficult to understand how counsel for the West Virginia Objectors can properly seek to block the class members he represents, who are giving a release of claims in West Virginia, from receiving the additional relief available under this settlement. Indeed, more than 400 West Virginians have already been identified as claimants by the Claims Adminstrator and just over half of all claims have been processed.[11] See Foley Decl., at ¶ 13.

More than two thirds of the West Virginia Objectors' memorandum consists of West Virginia counsel's assertions about who said what to whom and when. Much of this self-serving discussion is vigorously disputed by Plaintiffs' counsel and others. However, because the discussion is irrelevant to the objections, the misstatements about the circumstances of the

---

[10] In fact, if the number of opt outs had exceeded the "tipover" provision, the defendants had the option to terminate the settlement and the class would be harmed. See note 5, *supra*.

[11] Given the number of claims processed by Gilardi in relation to the total number of claims received, it is possible to extrapolate that approximately 800 West Virginians will ultimately have valid claims on file.

respective settlements are not addressed here. The actual objections raised by the West Virginia Objectors begin on page 16 of their memorandum. The first objection, that requiring claims forms from class members was inappropriate, is discussed *supra* at III.A.2. The other West Virginia objections similarly lack merit.

1. **The Declaratory and Injunctive Relief in the Settlement Does Not Institutionalize Illegal Charges or Practices. Nor does it Disadvantage Class Members or Create an Improper Standard in the Mortgage Industry**

The West Virginia Objectors assert incorrectly that certain charges permitted to Fairbanks in the FTC consent order "bless" or "institutionalize" charges that are illegal under various states' laws. West Virginia Obj., pp. 17-18. The Mahers echo this objection. The objectors do not even cite the provisions of West Virginia law that they claim are violated, let alone provisions of any other state's law.

As discussed in the FTC Memorandum (at p. 5), the Objectors have no standing to object to provisions of the consent order. It has already been approved by this court. However, the objection is also wrong on the merits. The West Virginia Objectors ignore Section VI of the FTC consent order, an express provision that preserves other applicable law as an additional limit on Fairbanks' charges:

> VI.    IT IS FURTHER ORDERED that nothing in this Order shall permit the Defendants to impose any fee or take any other action that is prohibited by any state or federal law or regulation and/or prohibited by the loan instruments and/or other contractual agreement with the consumer.

This should fully dispose of the objection. However, the West Virginia Objectors cite other irrelevant material in support of their objection. First, they attach a letter from two United States Senators asking the FTC not to institutionalize any improper servicing fees. It is unclear why the opinions of two Senators who have not appeared in this matter, expressed in a private letter, should be treated as relevant at all. However, it is noteworthy that the letter is dated September 25, 2003, a date more than 45 days earlier than entry of the consent order. The FTC

then entered the order with the language quoted above in Section VI, *preserving* other applicable law. Tellingly, the Senators did not follow up with any additional letter concerning the consent order. Instead, the Senators appeared a joint press conference with the FTC in support of the consent order. FTC Memorandum, at 6. Clearly, the consent order addressed, rather than ignored, the Senators' concerns.

The West Virginia Objectors also attach a flyer marketing a seminar sponsored by the American Conference Institute. The flyer establishes nothing that supports the West Virginia objection. Indeed, at the top of page 2, the flyer reflects a concern, if anything, that this settlement imposes *higher* rather than lower standards on the servicing industry. It asks "Are You Prepared for the Intense Scrutiny of the FTC Regarding Your Servicing Processes?" and "Do Your Servicing Practices Measure Up to the Fairbanks Standards?" These questions belie the West Virginia Objectors' expressed concern that the servicing industry is now licking its chops to comply with lower standards than exist under current law.

Finally, the West Virginia objectors posit that the Default Resolution Practices ("DRP") that will be imposed on Fairbanks if the settlement is approved would prevent courts from applying principles of equity to resolve foreclosure disputes. West Virginia Obj., at p. 18. The Objectors provide no support for this assertion. In fact, there is nothing in the DRP that prevents Fairbanks from making such agreements. Rao Decl., ¶ 20. The agreement requires Fairbanks to establish processes to consider a variety of different types of plans to address foreclosure, plans that are not required under any borrower's contract or any state's laws. Rao Decl., ¶¶ 7, 11-18; DRP Agreement, ¶III.D. Nothing prevents Fairbanks from entering any agreement required by law. Indeed, a leading expert posits that these agreements will assist borrowers who might otherwise have lost their homes. Rao Decl., ¶ 17.

2. **The West Virginians May Not Properly Carve Out a Class From the Release at This Stage in the Proceedings.**

The West Virginia Objectors assert, without making a factual record, that certain West Virginia homeowners were confused by receiving two simultaneous class action notices. Their counsel omits to mention, however, that the notice he designed for the West Virginia class in his case expressly informs his class members that they may also be receiving notice of this nationwide settlement and that they "do not have to choose between them." *See* Notice of the West Virginia settlement, attached to this Memorandum as Exhibit 2, at p. 3, ¶D. Clearly, West Virginia counsel knew of this settlement when he designed and mailed notice with respect to his settlement. He chose not to explain how the settlements fit together.[12] Additionally, the remedy the West Virginia objectors seek, a "carve out" for West Virginians from the release provision of this settlement, is inconsistent with his notice that class member do not have to "choose between" the settlements and is contrary to applicable law.

As explained more fully in the Memorandum filed herewith by the FTC, West Virginians can receive *additional* benefits in this settlement to supplement those of the West Virginia settlement. *See* FTC Memorandum, at 13, n.10. When the West Virginia counsel asks to "carve out" his class members from the release here, he does not specify whether he expects his class members also to forego the additional benefits of this settlement. Nor does he explain why they would be better off, having released their claims in West Virginia, if they received less for their release.

Indeed, 400 West Virginians have filed claims for benefits under this settlement.*[13]* The law does not allow the West Virginia objectors to substitute their judgment for that of these class

---

[12] West Virginia Counsel appears to think that the notice in this case should have explained the relationship between the two settlements, but does not address the myriad reasons why it would have been easier and less confusing for the West Virginia-only notice to have addressed this issue. (West Virginians represent just 0.4% of the national class.)

[13] See note 9, supra and accompanying text.

members by carving them out of this settlement, without their express consent. Many courts have held that neither class counsel nor a class member may opt-out or request exclusion on behalf of a class of individuals -- or even another single class member -- because allowing opt-outs by proxy violates due process:

> The right to participate, or to opt-out, is an individual one and should not be made by the class representative or the class counsel. There is no class action rule, statute, or case that allows a putative class plaintiff or counsel to exercise class rights en masse, either by making a class-wide objection or by attempting to effect a group-wide exclusion from an existing class. Indeed, to do so would infringe on the due process rights of the individual class members, who have the right to intelligently and individually choose whether to continue in a suit as class members.

*Hanlon*, 150 F.3d at 1024-25; *see also Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 412 (2d Cir. 1975) (allowing parties to opt-out on behalf of other parties "would lead to chaos in the management of class actions"); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 439 (S.D. Tex. 1999) (same); *cf. In re Prudential Ins. Co. of America Sales Practices Litig.,* 148 F.3d 283, 294 & n.14. (3rd Cir. 1998) (affirming district court order denying attempt to execute opt-outs on behalf of an entire sub-class). The Settlement Agreement here also precludes exercise of opt out by proxy. *See* Settlement at II.B.5.

**C. The Other Two Objections Were Filed By "Professional Objectors." These Objections are Predictably Without Merit.**

Several of the attorneys representing objectors to this settlement are so-called "professional objectors" who specialize in objecting to class action settlements. Specifically, all the non-Massachusetts attorneys for Deborah Corbin (Paul S. Rothstein, Edward W. Cochran, Frank H. Tomlinson, and N. Albert Bacharach, Jr.) as well as the attorney representing Stephen Weinstein (John Pentz) appear frequently on behalf of class action objectors. *See, e.g.*, *Reynolds v. Beneficial National Bank*, 288 F.3d 277 (7th Cir. 2002) (Tomlinson); *In re Warfarin Sodium*

*Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002) (Bacharach, Cochran, Rothstein, Tomlinson);

*Spark v. MBNA*, 48 Fed.Appx. 385, 2002 WL 31059209 (3rd Cir. 2002) (Pentz on behalf of an

entity denominated "the Objectors Group"); *Tenuto v. Transworld Systems, Inc.*, 2002 WL

188569 (E.D.Pa.) (same); *In re VISA Check/Mastermoney Antitrust Litigation,* 297 F.Supp. 503,

516 (E.D.N.Y. 2003) (Cochran, Pentz); *In re Compact Disc Minimum Advertised Price Antitrust*

*Litigation*, 2003 WL 22417252, fn. 3 (D. Me. 2003) (noting Mr. Pentz's status as a repeat

objector in class action cases).

As the authors of *Newberg on Class Actions* observe, the practice of filing objections to

proposed class action settlements has become, for some, "big business." *See* Conte & Newberg,

4 *Newberg on Class Actions* (4th ed. West 2002) ("*Newberg*") § 11:55 at p. 168. *These same

attorneys' objections were rejected in *Reynolds*, where the Seventh Circuit stated that "the

objectors added nothing," also rejecting their bid for fees. 288 F.3d at 289. They were rejected

in *Synthroid*, where the court found that the objectors did not "sharpen[] the issues and debate on

the fairness of the settlement . . . ." 201 F.Supp.2d at 882-83. They were rejected again in

*Warfarin*, where the court found the objections to settlement class certification, to the notice, and

to the attorneys' fees award "unpersuasive," 212 F.R.D. at 251-52, 253, 262, and observed that

the objections to the fairness of the settlement filed by, among others, Mr. Cochran and Mr.

Rothstein, appeared to "arise from a misunderstanding of the settlement." *Id.* at 258.

While the Court must consider all objections, including those lodged by these counsel,

their questionable track records suggests their contentions must be carefully scrutinized for their

actual applicability to the settlement at issue. The Corbin objection, for example, is a word for

word copy (including typographical errors) of an objection the same lawyers filed in another

recent case involving Plaintiffs' counsel. *See* Declaration of John Roddy, [Docket No. 58].

1. **The Corbin Objection Lacks Merit.**

The Corbin objection is boilerplate. It contains no relevant citations to caselaw or relevant Rules. One of the main purposes of the objection procedure in a class action is to create dialogue about perceived problems with the settlement. When a specific objection is raised, class counsel and the Court can weigh its merit and respond accordingly. Obviously, that purpose is not achieved if someone simply files a vague, boilerplate objection with no regard to the content of the actual settlement. Here, as seen from the Roddy Declaration, almost the entirety of the objections in the Household and Fairbanks case are identical. It contains no specific information about the substance of Corbin's objections whatsoever. The Corbin objection thus offers nothing to this Court's evaluation of the fairness of the settlement.

Corbin's undefined concerns about the notice and the release are addressed above. The claim that it is "highly likely" that the claims made here will total much less than $40 million is disproved by the 236,000 filed claims and by the Settlement Administrator's report. The entire $40 million settlement fund will be distributed here. It will also be supplemented by at $7 million in reverse and reimburse benefits as described in the Settlement Agreement and the notice. *See also* Declaration of Kim A. Stevenson, ("Stevenson Decl."), at ¶ 6; Declaration of Michael Donovan ("Donovan Decl."), at ¶ 7.

The actual minimum value of the settlement agreement is known, because the claims are already on file. There is no reason to entertain Objector Corbin's suggestion that the attorneys' fee award "be held in abeyance."

## 2. The Weinstein Objection Also Lacks Merit.

The Weinstein objection posits an interclass conflict between foreclosed borrowers and borrowers who paid late charges or default related fees.[14]  In his view, this supposed conflict requires certification of subclasses. The facts are otherwise.

In this settlement, virtually any claimant who receives benefits as a foreclosed borrower also paid late fees and default related fees.  Such individuals, including Weinstein,[15] have received multiple claims forms in order to ensure that they may benefit from both distribution pools.  In short, this settlement does not present a situation where two groups of individuals have a competing interest in the same limited pool of funds.  Instead, there are overlapping interests that are ameliorated by the fact that borrowers can receive money from both pools.

Weinstein relies exclusively on *Amchem Products v. Windsor*, 521 U.S. 591 (1997) and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999), both of which involve fact scenarios that are entirely distinguishable.  In *Amchem* the perceived conflict was between one group of class members whose injuries were already manifest and a wholly different group of class members who had an interest in preserving the available settlement fund in case they later discovered an injury not yet manifest.  There was no way to satisfy the claims of one group without diminishing the pool available to the other.  *Ortiz* presents the same basic conflict.

In contrast, here, borrowers like Weinstein benefit from the existence of both pools.  The interests involved are not conflicting, but rather intersecting.[16] *See In re Prudential Ins. Co. America Sales Litigation*, 148 F.3d 283, 313 (3d Cir. 1998) (*Amchem* does not require division

---

[14] The Weinstein objection to Attorneys Fees is addressed in Plaintiff's Memorandum in Support of Motion for Attorney's Fees.

[15] Notably, Mr. Weinstein attaches his claims form for his default and delinquency claim to his objection as Exhibit 1. He is entitled to a claim based on payment of fees in the amount of $1,891.42 with respect to default and delinquency charges he has paid.

into subclasses whenever class members have distinct legal claims); *Lazy Oil Co. v. Witco Corp.,* 166 F.3d 581, 590 (3d Cir. 1999) (denying objectors' motion for subclass certification absent record of direct conflict between competing class member interests).

Weinstein is also wrong about the scope of his foreclosure damages. He asserts that they are several hundred times as great as the damages caused to class members who only paid improper late fees and other fees. First, Mr. Weinstein assumes that his foreclosure and all Fairbanks' foreclosures were wrongful. That is not the case. Borrowers who were foreclosed upon virtually all had an actual default at the time of foreclosure. (Weinstein's affidavit does not assert otherwise.) If they choose to litigate rather than accept the benefits of the settlement, the majority have no basis to assert, as Weinstein claims he does, that the entire amount of their lost equity is an element of their damages. Those few who could establish otherwise had the opportunity to opt out and thereby to pursue their unusually large claim for damages.

Additionally, there were several procedural safeguards in the settlement process here to protect against an improper allocation grounded in interclass conflict. First, many of the named class representatives, like Weinstein, are eligible to receive money from both pools in the redress fund. Marlene Brenes, for example, a named plaintiff in the Curry class action as originally plead, is in a position identical to that of Weinstein. She carefully reviewed and approved the settlement agreement without reservation. Additionally, under the settlement, the FTC reserved to itself the final authority to determine the structure of the redress pool. Settlement Agreement, ¶ III.3. The FTC analyzed various data to determine that its allocation was fair. See generally FTC Memorandum submitted contemporaneously herewith. The FTC thus sought to ensure that the settlement provided for appropriate distribution of the fund among class members.

---

[16] If Weinstein were appointed to represent a foreclosure subclass as he requests, he would have a conflict of interest, because he would also be a member of the default and delinquency subclass.

At bottom, Weinstein and his counsel are not in this process to ameliorate the circumstances of the class or any purported subclass, but rather instead to attempt to use the settlement as a means to line their own pockets. That was made clear when Mr. Pentz recently sent a demand letter to Co-lead counsel, on behalf of Weinstein, demanding $110,000 in special damages, apparently from the settlement otherwise available to the class. *See* Letter from John Pentz to Niall McCarthy dated April 29, 2004 attached hereto as Exhibit 3. If Weinstein truly had the interest of anyone other than himself at heart, he would understand the difficulty inherent in obtaining special damages for himself from a limited pool. Moreover, if Weinstein were as certain of his claims as he purports to be, he and his counsel had the opportunity to opt out and seek additional relief in an appropriate forum.

## IV.   THE *PRO SE* OBJECTIONS, WHILE REFLECTING UNDERSTANDABLE FRUSTRATIONS, MUST ALSO BE OVERRULED.

Twenty individuals have filed 17 different *pro se* objections. The number of such objections pale by comparison to the 236,000 individuals who have filed class claims and appararently support the settlement. The majority of the *pro se* objections assert that the settlement relief being provided is insufficient. This concern is addressed at Section II, *supra*.

Some of the objectors (Timothy Stites, Laurel Crosetto, and Fernando and Kathy Hernandez) also present compelling stories of personal hardship for which they wish compensation outside the redress plan. Others (Levi Butler, Carol Jean Henry, Richard Hubeny, Brenda Manson, Linda Latorre, and Laurel Cosetto) appear to share the mistaken belief that the role of the court in the settlement approval process allows it to make significant individual awards of specialized damages. Several of these objectors (Brenda Manson, Jen-Shen Song, Fernando & Kathy Hernandez, Fernando and Carmen Zapater, and Laurel Cosetto) provide detailed documentation that they believe support substantial individual claims.

These objectors clearly misunderstand the process of settlement in a class action case, based on an apparent belief that the settlement should provide individualized remedies. To the extent that they do have legal claims that far exceed the value of the amounts available in this settlement, they had the opportunity, clearly described in the notice, to opt out of the settlement and avoid the release. These objections must therefore be overruled as not well founded.

Two objectors (Pauline Rowl, Jen-Shen Song) file objections that Plaintiffs' Counsel, despite best efforts, cannot understand sufficiently to provide a response. Another objector (Malcolm Scoon) misunderstands the structure of the settlement. It is not the case that some claims are paid in full from the redress fund and others are not. Two objectors (Kimberly Millis Maher and Patrick Maher) complain that Fairbanks has not implemented a settlement agreement achieved in individual litigation. This action would not bar that claim. One "objector" (Essie B. Williams) actually appears to agree with the settlement.

A few points raised by the pro se objectors merit some additional attention:

## A. The Settlement Will Not Automatically Repair Credit Problems on an Individual Basis

Objectors Marcus Cleveland, Colaine Curtis, Jack Hosterman, Timothy Stites, and Richard Hubeny complain that Fairbanks' conduct has damaged their credit. They seek additional redress or injunctive relief that would address their credit problems.

This is a difficult issue in consumer cases involving lender overcharges. Credit problems can be an unfortunate collateral consequence of certain types of loan disputes. However, because discovery reveals that the vast majority of class members actually were in default at some point during the class period, the fact of the overcharges did not itself undermine the class members' credit.

It is possible, of course, that in some instances, credit information was misreported. As part of the change in operational practices Fairbanks has agreed to correct inaccurate information

reported to credit bureaus. DRP, § II.F. Those operational practices will not go into effect until the settlement is approved. In addition, a portion of the FTC Consent Order addresses disputes and Credit Reporting issues. ¶ XIV.

Additionally, under the Fair Credit Reporting Act, consumers have the right to dispute inaccurate information reported by creditors. Inaccurate information must be corrected. 15 U.S.C. §1681s-2. This may help those class members with legitimate concerns about Fairbanks' reporting mistakes to have such errors corrected. At the same time, it is virtually impossible, especially given the size of the fund, to provide actual damages in the settlement calibrated to credit reporting errors.

**B. Disputes About the Amounts on Claims Forms Should Be Addressed to the Claims Administrator and the FTC.**

Objector Levi Butler and Gordon & Marcia Lupo have filed objections that appear to be disputes about the accuracy of the amount reported on their claims forms as total default and delinquency charges. Those disputes can be addressed by the Claims Administrator and the FTC in the context of the distribution process. If a borrower has documentation that the claim amount is wrong, the proper avenue for redress is by a claims dispute rather than by an objection.

**C. Continuation of Illegal Practices By Fairbanks**

Several of the *pro se* objectors assert that Fairbanks continues to engage in illegal conduct. Plaintiffs' counsel has obtained confirmatory discovery indicating that Fairbanks has gone to great lengths to improve its practices. See Hollingsworth Affidavit attached as Exhibit 2 to Plaintiffs' Memorandum in Support of Final Approval of Settlement. At present, the injunctive relief and monitoring provisions of the FTC Consent Order are also in place.

However, final approval of the settlement agreement is necessary to create an enforceable agreement providing for the Operational Practice Changes. Similarly, the foreclosure avoidance programs and the default resolution procedures of the negotiated Default Resolution Program

await final approval.  If alleged illegal practices do indeed continue or resume (and all share the hope that they do not), the settlement will provide additional mechanisms to hold Fairbanks accountable.

## V. CONCLUSION

The objectors to this settlement constitute just 0.004% of the settlement class.  The objections misunderstand or misstate the settlement.  The objections are scattershot in nature and are presented without supporting factual or legal authority.  Plaintiffs request that each be overruled, that the final approval order be entered and that the settlement be allowed go forward to accommodate the 236,000 individuals who filed claims and wish to be paid.

DATE: May 3, 2004

_/s/Gary Klein_____
Gary Klein (BBO #560769)
John Roddy. (BBO #424240)
Grant Klein & Roddy
727 Atlantic Ave., 2nd Flr.
Boston, MA  02108
p. 617.357.5500 ext. 15
f. 617.357.5030
Email: klein@grantroddy.com

 _/s/Kelly Dermody_____
Kelly M. Dermody
Lieff, Cabraser, Heimann &
Bernstein, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000
Email: kdermody@lchb.com

 _/s/Niall McCarthy_____
Niall P. McCarthy.
Cotchett, Pitre, Simon & McCarthy
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame CA 94010
p. 650.697.6000
f. 650.692.3606
Email: nmcarthy@cpsm.com

 _/s/Daniel Mulligan_____
Daniel Mulligan
Jenkins & Mulligan
660 Market Street, 3rd Floor
San Francisco, CA 94104
(415) 982-8500
Email: dm-jandm@pacbell.net